WILLIAM J. McLAUGHLIN *vs.* WILLIAM LEON-
HARDT et al.

*Specific Performance of Contract for Sale of Shares of Stock
Refused.*

Plaintiff's bill in this case asked for the specific performance
of a written contract by which the two defendants gave to
the plaintiff an option to buy within a certain time eighty
shares of the stock in a corporation which had been created
by the defendants and was controlled by them. The evidence
of the defendants was to the effect that they had verbally
agreed to give plaintiff, who was their employee, an option
to buy a much smaller number of shares by way of acquiring
an interest in the business, and that they had signed the con-
tract sued on without reading it, and supposing that it em-
bodied the oral agreement. It appears from the evidence
that the object of the plaintiff, and of another stockholder
who had represented him in procuring the option, was to ob-
tain a majority of the stock and to deprive the defendants of
the control of the corporation. *Held,* that under all the cir-
cumstances of the case, it seems to be inequitable to grant
specific performance of the contract.

*Decided June 22nd, 1910.*

Appeal from the Circuit Court of Baltimore City (HEUIS-
LER, J.).

The cause was argued before BOYD, C. J., BRISCOE,
PEARCE, THOMAS, PATTISON and URNER, JJ.

*J. Kemp Bartlett* (with whom were *Edwin G. Baetjer*
and *Walter C. Mylander* on the brief), for the appellant.

*Thomas G. Hayes,* for the appellee.

PATTISON, J., delivered the opinion of the Court.

In this case William J. McLaughlin, the appellant, filed his bill against William Leonhardt and John H. Leonhardt, the appellees, asking for the specific performance of an option agreement, in writing by the terms of which the appellees, together with one George F. Faust, gave to the appellant the right or option to purchase from each of the appellees and George F. Faust, within a given time, at a stated sum, forty shares of the capital stock of the Leonhardt Wagon Manufacturing Company of Baltimore.

In the year 1870 William Leonhardt and John H. Leonhardt, his brother, the former a wheelwright and the latter a blacksmith, started, in the city of Baltimore, the business of manufacturing wagons which business they, as partners, conducted, with fair success, until 1887. At that time they were interested in a revolving shute coal wagon, of which they were the patentees. In order to place the wagon upon the market they found it necessary not only to give much of their time thereto, but likewise to spend considerable money in connection therewith.

At the suggestion and request of George Faust, father of George F. Faust, the son was taken into the firm and was sold a one-third interest therein, for which interest there was paid seven thousand five hundred dollars. The elder Faust agreeing in connection therewith to improve certain idle property belonging to him in a manner suitable to the business requirements of the new firm and to rent the same to it at a rental charge of five per cent. upon the value of the land and the cost of such improvements, the firm to pay the taxes, fire insurance, and to make such repairs upon the property as should be needed from time to time. In the conduct and management of the business, each of the members of the new firm had his individual duties to perform in connection therewith; the Leonhardts managed and superintended the manufacture of the products, while the office work devolved upon Faust.

In 1905 the health of John H. Leonhardt became impaired, and in consequence thereof it became necessary for him to be away from his home and business much of the time during the several succeeding years. During this period his mental condition became much involved and we are told by his family physician that at times he was absolutely incapacitated for the transaction of business and was at intervals in a sanitarium.

Through Faust, the appellant was employed as salesman for the firm at a salary of thirty dollars per week, with an understanding that he should have an interest in the business, although no definite amount of interest was agreed upon. He entered upon his duties the first of the year 1907.

Faust, on several occasions, prior to the employment of McLaughlin, had suggested the formation of a corporation and the taking over by it of the real estate occupied by the firm, formerly belonging to his father but since his death the property of Faust. This, however, was resisted by his partners, but after the entry of McLaughlin in the services of the company, the proposition was again made and was this time accepted by the Leonhardts and the corporation formed, and the property of the firm transferred to the corporation on or about August 1st, 1907. At the time of the incorporation, however, nothing was said by Faust in relation to taking over the real estate.

The capital stock of the corporation was fixed at fifty thousand dollars, divided into five hundred shares, each of the par value of one hundred dollars. One share was taken by each of the following persons: William Leonhardt, John H. Leonhardt, George F. Faust, Edward M. Leonhardt, son of William Leonhardt, E. W. Leonhardt, son of John H. Leonhardt, and William J. McLaughlin, and paid for in cash. The balance of the stock, consisting of four hundred and ninety-four shares, was divided about equally among the two Leonhardts and Faust. It was ascertained that the value of the property transferred by the firm to the corporation was

eighty thousand dollars, thirty thousand dollars in excess of the capital stock of the corporation. Therefore a note for ten thousand dollars, secured by a mortgage, was given by the corporation to each of the three members of the firm.

Shortly after the distribution of the stock, McLaughlin. through Faust, asked for six more shares of stock. This was sold to him, the two Leonhardts and Faust each selling him two shares at and for one hundred dollars per share. Mc-Laughlin had neither property nor money and in order to pay for this stock borrowed the required sum from Faust, giving him his note or notes therefor.

At the time of the sale of the stock, Faust testified that William Leonhardt stated "that he hoped that would not be all that McLaughlin would have, that they intended to give him an equal holding with the balance of us."

Some ten or twelve days thereafter, Faust, on behalf of McLaughlin, again called upon the Leonhardts asking that more stock be sold to McLaughlin. The Leonhardts testify that the quantity asked for by Faust on this occasion was forty shares of stock. William Leonhardt asked, "You mean of the entire block?" Faust assented and said "Yes." Then William Leonhardt said "That means thirteen shares apiece and one will give fourteen and he who has the most will give the odd one, or if not we will draw lots who will get the fourteen shares." It was then and there agreed that the three should sell unto McLaughlin forty shares in all.. Faust, however, in his testimony, stated that, "The understanding was that in order to give Mr. McLaughlin an equal holding with the balance of the principal parties concerned, we were to give him an option on forty shares each and that was as near as we could possibly divide it," and denied that anything was said in the conversation about the division of forty shares into three parts, two of thirteen and one of fourteen.

McLaughlin testified that on two separate occasions, William Leonhardt told him that he, McLaughlin, should have the same interest in the company as the rest. This state-

ment Leonhardt denied, but admitted that he said to Mc-Laughlin that he should have fair treatment with the company, but that he did not say he should have the same interest as the rest; nor was there any wish expressed or request made by McLaughlin for additional stock.

In August or in September, earlier than the sixth, William Leonhardt was in the office of the company and when in the act of leaving Faust called him and said, "Sign this paper before you go." Leonhardt replied, "What paper is that?" Faust said "The paper for the forty shares we promised Mac," meaning McLaughlin. Leonhardt replied, "All right." The paper was at the time turned down ready to sign and Mr. Faust's name was on it, when Mr. Leonhardt picked up the pen, signed it and walked out. In his testimony he stated he never had the least suspicion that there was anything the matter with the paper, that he never read it, that he relied upon Faust, in whom he had implicit confidence, to draw the paper as verbally agreed upon, and that agreement was for an option of purchase of forty shares in all and not forty shares from each of them; that he positively would not have signed the option had he known that by it he was giving an option to McLaughlin to purchase forty shares of his stock; that at no time before signing the paper had McLaughlin made known to him the number of shares he wanted, in fact, McLaughlin, personally, had said nothing to him about wanting any additional shares.

Faust, in his testimony, in speaking of the occasion of the signing of the option agreement by William Leonhardt, said, he presented the agreement to William Leonhardt; was not positive whether Mr. Leonhardt read it or inquired of him what it was, but he said to Mr. Leonhardt, "Here is the option of Mr. McLaughlin."

This paper when signed was afterwards, by Faust, mailed to John H. Leonhardt at Atlantic City with a letter from Faust accompanying it. The sending of the paper and the letter is admitted by Faust. The record discloses that the

letter was destroyed, but John H. Leonhardt, in his testimony, in stating its contents, said: "As near as I can remember it was distinctly an agreement enclosed in reference to the forty shares we had promised Mr. McLaughlin and to please sign it and return it to me and a few words of good wishes for my betterment, etc." At the time it was handed to him by the carrier, he was in the exchange of the hotel in company with two of his acquaintances, one of whom, Mr. Fox, he called upon to witness the paper, saying to him "I have a little paper sent to me here from home where three of us have agreed to allow a certain gentleman to have a few shares of stock." He did not read the paper before signing it for the reasons, first, he was not in a condition to take in and comprehend any paper, and Mr. Faust was at that time well aware of his condition; second, that he had the utmost confidence in Mr. Faust, feeling sure that the agreement was as verbally understood between the three of them. That had he known of the contents of it he would not have signed it. He further stated that he was at the time very weak and nervous, having been reduced to this condition largely by the heat and overwork required of him while in Baltimore in connection with the formation of the corporation.

Dr. William F. Gilroy, John H. Leonhardt's family physician, testified that so early as 1905 Mr. Leonhardt was suffering with the disease known as neurasthenia. That in 1905 he went to Atlantic City; that while there he visited him; that in 1905 his capacity for the transaction of business was simply lost entirely and was absolutely helpless both mentally and physically speaking; that he was not at Atlantic City in 1907, but saw him every week or two prior to his going to Atlantic City; that his condition then was about the same as it was in 1905, only it was exaggerated; that it was impossible for him to attend to business. Upon cross-examination he stated that he supposed there were times in 1907 that he was capable of making a contract. every man has those times; that he thought his worst period

in 1907 was along about September or August, although he did not see him while at Atlantic City, but saw him before he left in August and when he returned in October; he was better, however, when he returned. When he was at Atlantic City he was under his attention. In 1907 he thought Mr. Leonhardt "was able to read a paper and was capable of understanding at short duration but not prolonged, as he became very much fatigued; mentally competent in a way."

Nothing more was heard of this option agreement until one day in November, 1908, fourteen months after it had been signed, when William Leonhardt went to the office of the company and there found McLaughlin alone, and the following conversation was had between them, as related by Leonhardt. McLaughlin said, "Mr. William, I think I will take my shares. I said, Mac, you must have got rich. He said, Oh, no; I am going to borrow the money to pay for the stock. I says, Mac, that is a risky thing to do; you will have to pay interest. He said, I know, but I am going to run the risk. I said all right. I walked right out of the office and had no further conversation with him. A few days after that my brother came over and says, look here, Mac wants forty shares from me; am I to give all forty? The moment my brother said that to me, I said John, there is something wrong. I went over to the office immediately. Mr. Faust, I said, I understand Mac wants his shares. Mr. Faust says, yes. I said my thirteen are ready. He said but you signed for forty, and I told him then, you know we never agreed to do any such a thing. I immediately called Mr. McLaughlin over in my little office next door. I says, Mr. McLaughlin, there is something wrong here. I never agreed to give you forty shares of my stock, and said to him, where is that paper? He said I have it home. I said bring it down here, I want to see it. He says I will bring it in the morning. The next morning as soon as Mr. McLaughlin arrived at the office, I went to him for the paper and he said, I forgot it. I said, we want it here today, I

want to see it. He said, I will go home and get it." It was not produced, however, until a day or two thereafter, at the meeting of November 21st. The statement of Leonhardt as to this conversation with McLaughlin is practically borne out by McLaughlin's testimony, McLaughlin stating in addition thereto that he told Leonhardt that Faust had offered to lend him the money.

The first time that John H. Leonhardt's attention was called to this written option after he had signed it, was about the time that William Leonhardt's attention was called to it, and what was said in relation thereto is best given in his own language. "I stepped over in the office one day and Mr. McLaughlin was in the office all alone. As I walked in he said, Mr. John, I will be ready to take over the stock on Monday. I says, you will? He says, yes. He said, I am going to borrow the money and will be expected to pay the interest on it. I said no more to him but walked out of the office and I think it was the day following, I am not sure, I went back to him and asked him what he expected of me. wanting to know whether he wanted thirteen or fourteen, I wanted to know just how many he wanted, and he said forty. I gave him no answer to that whatever, but I went right over to my brother and told him of the conversation with McLaughlin, and he said, it looks like there is something wrong."

On November 21st, 1908, a stockholders' meeting was held; at which Mr. Faust, Mr. McLaughlin, E. M. Leonhardt, John H. Leonhardt and William Leonhardt were present. At this meeting the option agreement was produced by McLaughlin and read by William Leonhardt, which, omitted the formal parts, is as follows:

"Now this agreement witnesseth, that William Leonhardt, John H. Leonhardt and George F. Faust, in consideration of five dollars, to each of them in hand paid by the said William J. McLaughlin, the receipt of which is hereby acknowledged, to each of them, each covenanting for himself and not

for the others, hereby agree to give an option of purchase on forty (40) shares of each of their respective holdings in the aforesaid corporation at the par value of the said shares. That the aforementioned, in consideration of the aforegoing, further agree that this option may be exercised by the said William J. McLaughlin in whole or in part, provided always, that no share or shares of stock is or are to be transferred to the said William J. McLaughlin until the purchase price thereof shall have been paid in full to the owner or owners of such share or shares. And provided, further, that this option to be effective must be exercised within two years from the date hereof (September, 1907), at end of which time this option herein given shall expire and cease to be of any further force or effect."

The above option was typewritten, except the number of shares, which appeared in the handwriting of Faust.

William Leonhardt stated that after reading it he turned to Faust and said, "George, I signed that paper and never read it, but it is not as we agreed to do. He asked, why didn't you read it? I told him it was my implicit confidence in him that he had drawn the paper as we had agreed. Then I asked him, wasn't the promise of these shares made before this paper was drawn? He said yes. I said, how is it that your brother-in-law, Mr. Mylander, did not insert the number of shares but left a blank space and you filled it in with his (your) own handwriting? Mr. Faust said he didn't know. My brother also said that he had signed it without reading it and then and there charged Faust with taking advantage of his weakened condition at the time that he signed it, and we both then and there declared it a fraud practiced upon us." To this, as the Leonhardts testify, Faust made no response, although Faust, in his testimony in rebuttal, stated that he did respond, that he said that the agreement and option were in accordance with the understanding. He could not remember just what was said, the discussion, however, was not a lengthy one. He denied the

charges emphatically, but said no more in reply to the "vile accusations" for fear it would raise his temper. He also testified that he made the same denial to similar charges made at the meeting of November 28th.

By the testimony of both Faust and McLaughlin the eight thousand dollars required by McLaughlin to purchase the eighty shares of stock from William and John H. Leonhardt was to be loaned to him by Faust, and Faust was to sell to him his forty shares for four thousand dollars, no part thereof to be paid in cash. To secure the payment of this indebtedness, McLaughlin was to pledge this stock to Faust as collateral security therefor, this being the only security that Faust was to receive.

Had this option agreement been carried out by the sale and transfer of one hundred and twenty shares of the stock of the corporation to McLaughlin, the stock would then have been held as follows: McLaughlin, 127 shares; Faust, 124 shares; John H. Leonhardt, 119 shares; William Leonhardt, 114 shares; Edward M. Leonhardt, 11 shares; E. W. Leonhardt, 5 shares. It will be observed that the holding of McLaughlin would have been greater than any other individual stockholder, and that the number of shares thereafter held by McLaughlin and Faust would have been two hundred and fifty-one, while the number of shares held by William and John H. Leonhardt and their respective sons would have aggregated only two hundred and forty-nine, giving to Faust and McLaughlin a bare majority of one. Therefore, as a result of such sale and transfer of stock, the control of the corporation would have passed from the Leonhardts to Faust and McLaughlin.

William Leonhardt testified that it was several days, at least, after learning of the contents of the option and after its repudiation by him that he fully realized and appreciated the effect that the transfer of the stock, as sought by Faust and McLaughlin, under this option, would have upon the management and control of the corporation.

At the meeting of November 21st, John H. Leonhardt asked McLaughlin, "Did you in any way or manner negotiate for this stock?" To which McLaughlin replied, "No." Quite a controversy followed and Faust said, "I am getting sick of this and want to sell out." To which William Leonhardt replied, "Well, if that is a fact and Mr. McLaughlin is sincere and wants the one hundred and twenty shares, sell him the whole stock and I will take the balance." Mr. Faust said, "What about the building?" To which William Leonhardt replied, "The building will go on as usual."

At this time the corporation had on deposit with Alexander Brown & Sons ten thousand dollars, and at the Old Town Bank from one to two thousand dollars.

In December, 1908, Faust executed unto one Herman Loock an option agreement for the purchase of his stock, agreeing therein that if William and John H. Leonhardt, under the alleged option agreement executed by them and Faust to McLaughlin, should each transfer unto McLaughlin forty shares of the capital stock of the corporation, then he would sell unto Herman Loock, for the sum of twenty-four thousand dollars, the mortgage held by him against the corporation, amounting to eight thousand dollars, and his one hundred and sixty-four shares of its capital stock, which constituted his entire holdings and included the forty shares that under the alleged option agreement he was to transfer to McLaughlin; with the further proviso that the corporation should take over his real estate at and for the sum of thirty-five thousand dollars, the value of which real estate was estimated by three witnesses produced on the part of the appellees, Loock, to whom the option was given, Samuel B. Fauth, tax assessor of the City of Baltimore, and Mr. Bernard, a real estate dealer, to be $25,000.00, $25,513.00, and $24,418.49, respectively; with the further proviso that all undivided profits of 1907 and all profits of 1908 should be divided in full (without any reserve whatever) among the present stockholders according to their respective holdings

as shown on the stock book December 29th, 1908.    The op-tion, however, was never exercised by Mr. Loock.

Faust testified that this option was given in order to get rid of the Leonhardts, for after this controversy he wanted no further associations with them, and that inasmuch as the business of the corporation had been carried on for twenty years in the property owned by him, it would cripple the business if they should remove therefrom and he would give them the "building and all in order to get rid of the whole thing," although their relations up to the time of the controversy had been very pleasant, so pleasant that he had favorably commented upon it.

Subsequent to the stockholders' meeting of November 21st, McLaughlin tendered to William and John H. Leonhardt each, the money for forty shares of stock in accordance with the alleged option agreement, and upon their refusal to accept the money and transfer the stock to McLaughlin under the terms and provisions of the alleged option agreement, McLaughlin filed his bill in this case asking for the specific performance of the option agreement, and upon the submission of the case to the Court below it dismissed the bill, and it is from that order dismissing the bill that this appeal is taken.

Our predecessors so early as the case of *Griffith* v. *The Frederick Bank,* 6 Gill and Johnson, 439, clearly stated the law applicable to and governing in suits for specific performance of agreements. "In the first place, it is to be observed that this Court, in decreeing the specific performance of agreements, exercises a discretion, not an arbitrary one, but a sound judicial discretion, regulated by fixed and established rules; and therefore says—2 *Powell on Con.,* 221—'no rule is better established than that every agreement to merit the interposition of a Court of Equity in its favor, must be *free from fraud, circumvention or surprise,* or at least, such an agreement must, in its effect, ultimately tend to produce a *just end.'* If any of these ingredients are want-

ing, or that object be not in view, Courts of Equity will not decree a specific performance." Again, this Court said: "It does not follow, as a matter of course, that because the legal obligation under the contract may be perfect, therefore the equitable power of the Court will be exercised to compel. or effect specific execution. In every case, the question is, whether the exercise of that power is called for to subserve the ends of justice; and unless the Court is satisfied that the application to it, for this extraordinary assistance, is *fair, just and reasonable,* in every respect, it will refuse to interfere, and leave the party to other remedies for redress." *Semmes* v. *Worthington,* 38 Md. 325.

As was said by this Court, speaking through the late CHIEF JUDGE McSHERRY, in the case of *Sommerville* v. *Coppage,* 101 Md. 523: "There ought to be no controversy over the equitable principles applicable to the condition of facts above set forth. Even when a particular contract falls under a class in which the equitable jurisdiction invoked in all applications for specific performance *may* be exercised, the right to that relief upon that contract is not absolute, like the right to recover a legal judgment. 3 *Pom. Eq.,* sec. 1404. The principle that the specific performance of contracts is not a matter of right, but rests within the discretion of the Court, does not mean that the Court may arbitrarily direct one contract to be performed and refuse the relief in the case of another, but it means that the Court takes into consideration the conduct of the plaintiff, and all the circumstances of the case, and the mere fact that a valid contract exists is not conclusive in the plaintiff's favor. *Bamberger* v. *Johnson,* 86 Md. 38. It is a well-established rule that in suits for the specific performance of agrements, even when written, the defendant may, by means of parol evidence, show that through the mistake of both or either of the parties, the writing does not express the real agreement, or that the agreement itself was entered into through a mistake as to its subject-matter, or as to its terms. In short, a Court

of Equity will not grant its affirmative remedy to compel the defendant to perform a contract which he did not intend to make, or which he would not have entered into had its true effect been understood. 2 *Pom. Eq.,* sec. 860. In proceedings of this kind the Court takes into consideration all the circumstances of the case, notwithstanding a valid written contract may exist; it is competent to inquire whether under those circumstances it would be just to grant the relief sought."

Upon the application of these principles to the facts stated, we are now to determine whether or not the aid of a Court of Equity should be granted unto the plaintiff in the enforcement of the specific performance of this option agreement.

In the determination of this question we should carefully consider and weigh well all the facts and circumstances connected with the execution of this agreement, including not only the conduct of the plaintiff and defendants in connection therewith, but also the acts and conduct of Faust, acting for and in conjunction with McLaughlin, in procuring the execution of this agreement by the defendants, and therefrom ascertain whether or not the agreement has those essential ingredients that entitle the plaintiff to the interposition and aid of a Court of Equity.

The defendants admit that they attached their signatures to this paper and that they did so without reading it, but allege that in so doing they acted upon the false representations of Faust, acting for and on behalf of McLaughlin, and signed it with a mistaken conception of what the paper contained.

It is admitted that previous to the execution of this alleged agreement the subject-matter thereof was discussed by Faust, representing McLaughlin, and the defendants, and that a verbal agreement concerning it was reached, but they differ as to the terms of this agreement. Whether Faust's statement or the statement of the two Leonhardts, as to the

terms of this verbal agreement, is correct, we will not say, but the preponderance of evidence is in support of the defendants' contention that the number of shares to be sold and transferred to McLaughlin was but forty, a part of which was to be transferred by each of them, as stated by the Leonhardts, and that they signed the option with the impression that it contained the terms of this verbal agreement as understood by them.

The defendants, however, charge that the execution of this agreement by them, procured by Faust on behalf of McLaughlin, was part of a general fraudulent scheme or plan by which the control and management of the corporation should be wrested from the Leonhardts and given either to Faust alone or jointly with McLaughlin, alleging that the stock which was ostensibly to be sold and transferred to McLaughlin, was, in fact, to be the stock of Faust, or if not his stock, that it was to be used by him in controlling the affairs of the corporation in a manner subservient to his own interests. In support of this claim, the attention of the Court is called to the fact that McLaughlin was, until six months prior to the execution of this contract, unknown to the Leonhardts. At that time he entered the services of the company as a salesman at a stipulated salary, with an understanding that, at some time, an undefined interest in the business of the company should pass to him.

A short while after the formation of the corporation and after the first distribution of the stock, we find Faust calling upon the Leonhardts, asking for the sale and transfer to McLaughlin of six shares of its stock. This request was granted and that number of shares sold and transferred to him. McLaughlin having no money with which to pay for it, borrowed the whole sum from Faust, giving him his note or notes therefor.

Within ten or twelve days thereafter, and while McLaughlin was still owing Faust for the shares already bought, the Leonhardts are again approached by Faust, in behalf of Mc-

Laughlin, asking this time, as the Leonhardts allege, for the sale to him of forty shares, the value of which was four thousand dollars, or as Faust says, for one hundred and twenty shares, the value of which was twelve thousand dollars; that if sold and transferred to him, the whole amount of the purchase money of the Leonhardts' stock was to be loaned to McLaughlin by Faust, and his own stock to be transferred without the payment of any part of the purchase money therefor in cash, the whole indebtedness, so created in the purchase of this stock, to be secured by the hypothecation to Faust of the stock so bought, with no other security.

Faust states that when he called the second time upon the Leonhardts for the sale of stock to McLaughlin, he asked that forty shares be sold and transferred by each of them and himself, saying that this was *as near as they could possibly divide it and give to all* the principal parties concerned an *equal* interest. He further stated, and in this he was joined by McLaughlin, that William Leonhardt at other times had promised to give to McLaughlin an interest in the company *equal to, or the same, as the rest.*

These statements were made in support of their contention that by the verbal agreement the number of shares to be sold and transferred was one hundred and twenty and not forty only. Yet it will be observed that when one hundred and twenty shares are added to the number already owned by McLaughlin, he would then be the holder of one hundred and twenty seven shares, eight more than William Leonhardt, thirteen more than John H. Leonhardt, and three more than Faust. Forty shares, the number inserted in the option in the handwriting of Faust, which we will assume was done prior to the execution of the agreement, from each of the two Leonhardts and Faust, were not required to give *an equal interest to McLaughlin,* but were necessary in order to give a *majority of one share* of the whole stock to Faust and McLaughlin.

After the attempted exercise of the option on the part of

McLaughlin and at the time when he was insisting upon the transfer of this stock by the Leonhardts, Faust executed the option agreement with Loock, in which he agreed that *if the Leonhardts transferred their forty shares each* unto McLaughlin, under the option to him, he, Faust, would then sell to Loock his one hundred and sixty-four shares of stock at par value, which included the forty shares he, under the same option executed with the Leonhardts, was to sell to McLaughlin. In his option to Loock he makes the sale of the stock to him conditional upon the Leonhardts transferring to McLaughlin, under *their* agreement with him, forty shares each, while he, in total disregard of *his agreement* with McLaughlin, agrees, in his option to Loock, to sell the same stock to him. In the sale of this stock to Loock, he reserves a portion of the dividends and deposits in bank; with a proviso that the corporation thereafter purchase his real estate at a price far in excess of its value, as shown by the testimony.

These are significant facts in support of the contention of the defendants that this agreement was not made in good faith, and was part of the alleged fraudulent scheme to obtain from the Leonhardts a sufficient number of shares to wrest from them the control and management of the corporation, in order that it might thereafter be conducted by Faust and McLaughlin in a manner subservient to their own interests.

There are other facts and circumstances that we might allude to that aid in further coloring this transaction, but we do not think it necessary to discuss them. If Faust and McLaughlin are not guilty of fraudulent conduct in connection with the execution of this agreement, then, to say the least, they are unfortunate in being the victims of circumstances which seriously assail the *bona fides* of this transaction and strongly point to deception and wrong-doing on their part.

We do not think this is a case where a Court of Equity should grant its aid in the specific performance of the con-

tract. We therefore affirm the order of the Court below dismissing the bill.

*Order affirmed, with costs to the appellee.*