# WILLIAM STEWART DIFFENDERFFER *vs.* FRITZE KNOCHE.

*Contracts; rescission.　Specific performance; mistake.*

Two brothers each owned a stable near together; A., agreed to
purchase one stable, thinking all the while he was agreeing
to purchase the other: *Held* that, under all the circumstances
he was not guilty of inexcusable carelessness, and that the
agreement should not be specifically enforced.　　p. 197

A contract made by the parties and reduced to writing will not
be disturbed or rescinded by a Court of Equity for trivial
causes; in order to justify the recission of such a contract,
the proof must be clear, convincing and such as should prop-
erly appeal to a Court of conscience.　　p. 194

The right to the specific performance of a contract is not
absolute; and if the contract is inequitable or harsh it will
not be enforced although the difference might not be such as
would warrant a rescission at the suit of the defendant.

p. 194

In general specific performance of a contract to buy land will
not be enforced if on account of mistake it does not accu-
rately express the terms really agreed upon.　　p. 194

Even a unilateral mistake on the part of the defendant may be admitted as a defense when to enforce the contract would be harsh and unreasonable.                    p. 195

But a mistake which is solely the result of the defendant's inexcusable carelessness is not a defense against specific performance.                    p. 195

*Decided May 10th, 1912.*

Appeal from the Circuit Court of Baltimore City (STUMP, J.). The facts in the case are stated in the opinion of the Court.

The cause was argued before BOYD, C. J.. BRISCOE, PEARCE, BURKE, THOMAS and STOCKBRIDGE, JJ.

*Thomas Mackenzie* (with whom were *Ogle Marbury* and *H. Findlay French* on the brief), for the appellant.

*Wm. C. Smith,* for the appellee.

BOYD, C. J., delivered the opinion of the Court.

This is an appeal from a decree dismissing a bill filed by the appellant against the appellee for the specific performance of a contract of sale of a property in Baltimore City. The contract sought to be enforced is as follows:

"BALTO., Nov. 14/11.

I have this day purchased from W. Stewart Diffenderffer the stable in fee, 1801 Lovegrove Alley for the sum of Four Thousand Dollars ($4,000) and agree to pay said sum of Four Thousand Dollars in cash, when deed is passed by my lawyer.

FRITZ KNOCHE."

"BALTIMORE, November 14, 1911.

Received of Mr. Fritz Knoche Five Dollars on account of purchase price of Four Thousand Dollars ($4,000) for stable 1801 Lovegrove Alley, Baltimore, Maryland, all taxes and other expenses adjusted to date of transfer of deed.

W. STEWART DIFFENDERFFER.

The above named property is in fee, and the deed to that effect must be given.

W. STEWART DIFFENDERFFER."

The defense relied upon by the appellee was that he was acting for and on behalf of George Doebreiner, who is engaged in business on North avenue, in the City of Baltimore, and it was the intention and desire of Mr. Doebreiner and himself to purchase the stable which was at the corner of an alley in the rear of Mr. Doebreiner's establishment, and that at the time the defendant signed the agreement he thought it was for that stable. The evidence shows that there were on Lovegrove alley, situated between two other alleys, three two-story brick houses adjoining each other— one being the stable of Charles R. Diffenderffer, another the garage of James Caldwell and the third the stable of the appellant. The stable nearest North avenue, where Mr. Doebreiner's establishment was, belonged to Charles R. Diffenderffer, who is a brother of the appellant, and a member of the same firm—Charles H. Ross & Co. They are in the wholesale liquor business, and the appellee, who is a "jobber of liquor," sometimes dealt with that firm, but testified that he only knew the appellant and had never seen Charles R. Diffenderffer.

The appellant and the appellee differed as to whether it was made known to the former that the stable was being bought for Mr. Doebreiner before the contract was concluded, but on the 22nd day of November, just eight days after the sale, the appellant and wife executed a deed to him for the property, which was tendered to the appellee's attorney on that day but he refused to accept it. The deed was drawn by that attorney and sent to the appellant to be executed before the mistake, as to the property, was known by him, and the appellant testified that he did not know that Mr. Doebreiner was the one to whom it was to be conveyed until he received the deed. He must, however, have known that the appellee was either buying it for a third party or to sell it again, as he testified that the appellee said to him "You know I do not want to work for nothing, and I expect to make something out of this I have got to get something out of this," and he agreed to give him one hundred and fifty

dollars, although he said he "understood that it was a rake-off for himself." However that may be, the testimony shows conclusively that the appellee was buying the property for Mr. Doebreiner, and that the latter, the appellee and a Mr. Max Miller went to see the stable, which now turns out to belong to Charles R. Diffenderffer, before this contract was made and thought that was the one for sale. There can be no doubt from the evidence that the appellee did believe that he was buying the one which is now shown to belong to the brother, and he signed the contract under that belief. It is true that the stable of the brother was No. 1805 Lovegrove alley, while that of the appellant was No. 1801, but the appellant admitted that the glass on which his number was fixed was broken, and the evidence is conflicting as to whether the number on the brother's stable was easily seen. There was a sign on each of the stables—the one reading, "For sale or rent. Apply to W. S. Diffenderffer, 109 Commerce Street," and the other was larger but had the same thing on it, except the initials were "C. R.," instead of "W. S."

The testimony shows that Mr. Miller, Mr. Knoche and Mr. Doebreiner were members of the board of directors of a building association, and that in May, 1911, they had considerable money on hand and were endeavoring to loan it out on mortgages. In talking the matter over Mr. Doebreiner, who was in the confectionery business and kept a number of horses, said that there was a stable back of his property which he would buy if he could get it for four thousand dollars, and give a mortgage for that amount on the stable and would include as additional security some ground-rents he owned. Mr. Miller went to see Mr. C. R. Diffenderffer, and made an appointment to go through the stable with him on the following Monday, which they did. He said Mr. C. R. Diffenderffer "showed me the brass stalls, the box stalls, and showed me up stairs with a living apartment in it, where anybody could live, and I thoroughly went through it." They failed to agree on the price—Mr. Miller offering four thousand dollars and according to him Mr.

Diffenderffer asked five thousand dollars, although the latter testified that he asked six thousand dollars and had refused to take less than that sum. Miller said he told the appellee about the stable, and that the appellee was president and he was treasurer of the Building Association. The matter was dropped at that time, but in November an application was made to the association for a loan on that stable by Mr. Doebreiner through Mr. Knoche, who had been authorized to buy it for Mr. Doebreiner, if he could get it for four thousand dollars. Miller had taken the appellee to the C. R. Diffenderffer stable in May, but they did not get inside of it at that time. Two or three weeks before the contract was made Mr. Freeman, a salesman of Charles H. Ross & Co., spoke to the appellee about a stable which Mr. Diffenderffer wanted to sell, and he went through the one he had been at before (which is the one owned by C. R. Diffenderffer), believing that to be the one referred to by Mr. Freeman, who was not with him at the stable, and he told him to tell Mr. Diffenderffer to come to see him. On the 14th of November, the appellant went to see him and the contract was made. They differ as to what occurred before the contract was signed—the appellee contending that he spoke to the appellant about the box stalls and a cedar box which were in the stable of what turned out to be that of C. R. Diffenderffer, while the appellant denies that he said anything to him about them, but testified that he offered to go with the appellee to the stable, but he said "That is not necessary. I know as much about it as you do. I was cut off short, and I did not think it worth while to press it any further, as he told me he knew as much about it as I did."

There were no box stalls in the appellee's stable at the time of the sale, but there were in that of the brother, which was in better condition and was apparently a better stable. On the day the contract was made the appellant gave the appellee the key to his stable, and the appellant's deed and abstract of title were sent to Mr. Smith, who was attorney for the Building Association and was also acting for the

appellee.  A few days after the contract was made, the
appellee went to the C. R. Diffenderffer stable, still think-
ing that was the one he had purchased, but he could not
unlock the door with the key appellant had given him.  He
called the appellant up on the telephone and told him the
key did not open the door.  After some conversation the
appellant agreed to meet the appellee at the stable, to see
what the trouble was and did meet him according to appoint-
ment.  He went to his own stable (No. 1801) and then
apparently for the first time the mistake was discovered.
The appellee refused to complete the purchase and this bill
was filed.  It is not shown that the appellee knew that both
of the brothers had stables on that alley, and he claimed that
he did not know C. R. Diffenderffer at all, although he had
occasionally met the appellant.  The two stables were only
about twenty feet apart and both were on corners—there
being an alley on the side of each running from Lovegrove
Alley.

We have thus stated the testimony at length in order to
show the circumstances under which what was manifestly a
mistake was made, and we will now consider the legal aspect
of the case.  The law is well settled and a sound public
policy demands that contracts made by parties and reduced
to writing shall not be rescinded or disturbed by Courts of
Equity for trivial or slight reasons, and in order to justify
the rescission of a contract the proof must be clear, convinc-
ing and such as should properly appeal to a Court of con-
science.  But it is equally well established that the right to
the specific performance of a contract is not absolute, and if
one is made under such circumstances as would make its
enforcement unjust, inequitable and harsh, it may be refused,
although the defense is not such as would warrant the rescis-
sion of the contract at the suit of the defendant.  In *Sommer-
ville* v. *Coppage,* 101 Md. 519, CHIEF JUDGE McSHERRY, in
speaking for the Court said: "The granting of the equitable
remedy is said to be a matter of discretion—not of an arbi-
trary, capricious, discretion—but of a sound judicial discre-

tion, controlled by established principles of equity, and exercised upon a consideration of all the circumstances of each particular case." Then, after explaining the meaning of what was meant by the discretion of the Court in such cases, he said: "It is also settled that specific performance will not be decreed of a written contract to buy land, which on account of a mistake does not accurately express the terms really agreed upon by the parties. *Kraft* v. *Egan,* 78 Md. 36. It is a well established rule that in suits for the specific performance of agreements, even when written, the defendant may, by means of parol evidence, show that through the mistake of both *or either* of the parties, the writing does not express the real agreement, or that the agreement itself was entered into through a mistake as to its subject-matter, or as to its terms. In short, a Court of Equity will not grant its affirmative remedy to compel the defendant to perform a contract which he did not intend to make, or which he would not have entered into had its true effect been understood. 2 *Pom. Eq.,* sec. 860."

The principle stated at the end of that quotation was repeated in *Thomas* v. *The G. B. S. Brewing Co.,* 102 Md. 423, and again in *McLaughlin* v. *Leonhardt,* 113 Md. 261, what was said by JUDGE McSHERRY was quoted with approval. In 36 *Cyc.* 605, it is said, "Unilateral mistake of a defendant, not caused or contributed to by plaintiff, has frequently been admitted as a defense, when to enforce the contract would be harsh and unreasonable. In many but not all of the cases defendant's mistake is that of his agent. But where the unilateral mistake was not induced or contributed to in any way by the plaintiff, the defense is confined to cases where to grant specific performance would be 'highly unreasonable'. A mistake which was solely the result of defendant's inexcusable carelessness is not a defense to a suit for specific performance."

Convinced as we are that the purchase by the appellee of the appellant's stable was undoubtedly the result of a mistake as to what he was buying, it would not only be "highly

unreasonable" to grant the appellant affirmative relief by the enforceemnt of this contract, but it would not reflect credit upon the administration of justice to hold that a Court of Equity was compelled, by reason of principles of law which govern it, to give its aid in the enforcement of a contract made under such circumstances as we have detailed. As will be seen from the above cited cases, this Court has held that in suits for specific performance the defendant can rely on the mistake *"of both or either of the parties"* in order to prevent a Court of Equity from giving affirmative relief to a plaintiff seeking to compel a defendant "to perform a contract which he did not intend to make, or which he would not have entered into had its true effect been understood." There is not the slightest suggestion in this record that the appellee was merely endeavoring to free himself from a contract deliberately entered into and afterwards regretted, but it is a clear case of such a mistake as a Court of Equity will permit a defendant to set up to prevent a plaintiff from compelling him to do what he never intended to do or *knowingly* contracted to do. Of course, in such cases the defendant should be required to prove the mistake by clear and thoroughly satisfactory evidence, and when that is done, there is far less danger of injury and injustice being done by the recognition of the rule we have announced than would result from aiding the plaintiff in the enforcement of what the Chancellor is satisfied only bears the evidence of a contract by reason of the mistake of the defendant.

It may be that a defendant has been guilty of such "inexcusable carelessness," as it is called in the above citation from *Cyc.*, as to deprive him of such a defense—especially if by his act he has caused the plaintiff to sustain loss. But it cannot be said that this appellee was guilty of "inexcusable carelessness." According to the evidence, he knew that a Mr. Diffenderffer owned the stable which he had examined and which he intended to purchase. He also knew that it was on Lovegrove alley and that the owner was a member of the firm of Charles H. Ross & Company. He only knew

one Mr. Diffenderffer in that firm and that was the appellant, and he did not know that each of two persons by that name owned stables in the block on Lovegrove alley. When Mr. Freeman told him that Mr. Diffenderffer had a stable on Lovegrove alley he told Mr. Freeman he knew more about the stable than he did—showing that he then had in mind the one which Mr. Doebreiner wanted, and which they had under consideration in May. When the only Mr. Diffenderffer whom he knew came to see him about the purchase of it he naturally supposed that it was the same stable he had examined. The numbers would not make any impression on his mind—especially if there was no number on 1801 and the one on 1805 was indistinct. He made just such a mistake as any one might make and he was not guilty of such negligence as could deprive him of the defense he relies on.

We will not discuss the exceptions to the testimony filed by the appellant. They are very general and we have no doubt that much of the evidence which would be included in the exceptions was relevant, competent and material. It tends to explain how the mistake was made and reflects upon the *bona fides* of the defense.

So without further prolonging this opinion by discussing other questions we will affirm the decree.

> *Decree affirmed, the appellant to pay the costs, above and below.*