## MORRIS KALAVAN ET AL. *v.* MORRIS HAMBURGER ET AL.

[No. 5, April Term, 1940.]

*Decided May 22nd, 1940.*

The cause was argued before BOND, C. J., OFFUTT, PARKE, SLOAN, MITCHELL, SHEHAN, JOHNSON, and DELAPLAINE, JJ.

*Eldridge Hood Young,* with whom were *Young & Crothers* on the brief, for the appellants.

*Jacob S. New,* for the appellees.

JOHNSON, J., delivered the opinion of the Court.

Morris Hamburger and Rachel Hamburger, his wife, owners, as tenants by the entireties, of certain adjoining houses located on North Broadway in Baltimore City and known as 1801, 1803, 1805, 1807 and 1813, filed their bill of complaint in the Circuit Court for Baltimore City against Morris Kalavan and Jacob Klotzman, alleging that defendants had on July 6th, 1939, through E. T. Newell & Co., Inc., purchased said properties at $1500 each at public auction after the same had been advertised by Newell & Co. in the Baltimore Sun. It was further alleged that in pursuance of said sale, complainants had procured the signatures of the purchasers to a written contract, a photostatic copy of which was thereunto annexed and made a part of the bill, and that by the terms of said contract the defendants paid as a deposit the sum of $500, and agreed to pay the balance due within thirty days, but had failed to make any further payment, although the time agreed upon so to do had previously expired; that complainants had made demand upon the purchasers to comply with its terms, but Kalavan and Klotzman had refused to pay the balance of the purchase money due thereunder upon said properties. They prayed specific enforcement of the contract referred to.

Kalavan and Klotzman answered the bill, denying that they were the purchasers of said five properties and as-

serting that Kalavan did purchase the corner property, known as 1801 North Broadway, for $1500, and he not having available funds to make a deposit thereon, Klotzman, the other respondent, who was known to the auctioneer, deposited with the latter his personal check for $500 as a deposit, whereupon the auctioneer requested that Klotzman also sign the contract, inasmuch as he had given his check for the deposit. They asserted, however, that it was not the intention of the respondents or of the auctioneer that Klotzman was to be regarded as the purchaser of the property known as 1801 North Broadway, further that Kalavan had offered to pay the balance of $1000 due by him for the property at 1801 North Broadway, but the complainants had refused to convey the same to him. It will thus be perceived that the issues between the parties as raised by the bill and answer are sharply drawn, complainants contending that they had sold through Newell & Co. to Kalavan and Klotzman five adjoining properties, while Kalavan and Klotzman denied that it was ever the intention of Klotzman to purchase either of said properties, but Kalavan had purchased one of them. Upon those issues, the case came on for hearing and the chancellor, after hearing in open court the testimony offered by the respective parties, decreed, (a) the specific enforcement of what was termed the contract of sale, a copy of which was filed with the bill; (b) that the defendants comply with said contract by paying unto complainants the balance due thereunder, the sum of $7000, with interest from August 6th, 1939, to which date all expenses and income for the properties were to be adjusted; (c) that in the event the defendants refused to comply with the terms of the decree within thirty days, a trustee was appointed to resell said properties at the risk of the defendants, and (d) that the defendants pay the costs of the proceeding. From that decree Kalavan and Klotzman have prosecuted this appeal.

The principal contentions advanced by the appellants are, (1) that the contract relied upon is uncertain; (2)

that the purchase of only one property, viz: No. 1801 North Broadway, was intended and that by Kalavan alone; (3) that the contract is lacking in mutuality. The last contention is based upon the fact that the authorization to the auctioneer to sell the properties was from Morris Hamburger only. This is inferred from the advertisement which appeared in the Baltimore Sun, to the effect that the property was being sold by Newell & Co. "by order of Morris Hamburger," and from the additional fact that the authorization to Newell & Co. was signed only by him. But Rachel Hamburger, his wife, testified that she had "left everything" to her husband. She is a party to the suit and it would seem clear that this fact makes the remedies mutual. 5 *Pomeroy's Equity Jurisprudence* (2nd Ed.), Sec. 2192; *Engler v. Garrett,* 100 Md. 387, 59 A. 648.

The first and second contentions will be considered together after reviewing the evidence shown by the record.

The properties had, prior to July 6th, 1939, been advertised in the Baltimore Sun by the auctioneers, the sale to take place at four o'clock in the afternoon upon the date last mentioned, but in those advertisements nothing appears to indicate that they would be sold as an entirety, nor that one of them would be sold with the understanding that its purchaser was required to take the other four at the same price. It further appears from the advertisement that a deposit of $200 "on each lot at the time of sale" was required to be paid and the balance was payable in thirty days, all adjustments to be made to the date of transfer, so that from a careful reading of the advertisement a person of average intelligence would naturally conclude that the properties were to be sold separately, and this evidently was the first plan, because the auctioneers had five separate contracts, one of which applied to each of the properties, which they intended to have signed by the purchasers after the sales had been held. Just when this plan was changed does not appear from the record, but it is shown that, at

the hour mentioned in the advertisement, the auctioneers were present at No. 1801, being the corner property, and, before beginning the sale, it was announced that the purchaser of 1801 would be required to take the remaining properties at the same price. However, at that time neither Kalavan or Klotzman was present, and after the auctioneer had cried the property for some minutes and succeeded in securing a bid of $1200, Kalavan and Klotzman rode up in a taxicab. One of them made a bid which was raised, and Kalavan or Klotzman continued bidding until $1500 was offered and it was struck off to Kalavan. Thereupon the auctioneer demanded $1000 deposit upon what he contended had been sold, which was an equivalent of $200 upon each property. Kalavan had already signed the memorandum of purchase and, he being without funds, Klotzman deposited $500, saying that sum was enough. The auctioneer knew Klotzman by reputation and considered him a responsible citizen, but did not know Kalavan. However, he accepted Klotzman's check for $500 over Hamburger's objection, and then informed Klotzman that, since he had accepted his (Klotzman's) check, the contract should be signed by Klotzman in addition to Kalavan. Klotzman then inquired whether he could transfer the contract to some one else when the transaction was put through, and was assured that no reason existed why he could not. The $500 deposit was then written in figures in the appropriate place upon the memorandum or contract of sale, the pertinent provisions of which are as follows:

"Baltimore, Md. 7—6—, 1939.

"I (we) hereby acknowledge and agree to the purchase by me. (us) of the property 1801 N. Broadway described in the advertisement, copy in said advertisement and all the terms and conditions of sale hereinafter set forth, for the sum of $1500. ea., of which $500.00 has been paid at the time of the signing hereof of which is hereto attached in accordance with and subject to all the terms and conditions of sale contained......"

(Evidently in the contract as printed the third and fifth lines are transposed.)

The auctioneer denied that Klotzman, when signing the memorandum of sale, told him he was not buying the property, but as early as August 3rd, 1939, counsel for Kalavan wrote Newell & Co., to the effect that his client, who had purchased 1801 North Broadway, was ready to consummate the sale upon the execution by Mr. and Mrs. Hamburger of a deed therefor, and demanded a return of the $500 deposit, should the Hamburgers be unwilling to accede to that arrangement.

John S. Townsend, vice-president of the Calvert Bank, gave testimony to the effect that he knew Klotzman, and a branch manager of his institution sent him in to see the witness concerning a loan upon the properties in the 1800 block of North Broadway, but he did not recall the amount desired; that he could not loan the amount asked by Klotzman, and when he found out it was leasehold property, he dropped the entire matter.

A. Brown DuBel, an official of the State Mutual Building Association, could not identify Klotzman, but testified that some one giving Klotzman's name came to his office as a result of a telephone call from the office of Newell & Co.; that he talked to the party representing himself as Klotzman and made certain memoranda to the effect that Klotzman wanted a loan of $5000 upon the Broadway properties and $5000 was applied for. The witness further produced a memorandum of the application, but it does not bear the signature of Klotzman and appellee admits Klotzman did not sign it. Mr. DuBel further testified that the loan was not made, because Klotzman did not wish to pay six per cent. interest upon it. The father of the witness and a Mr. Miller were present when Klotzman called at the building association office, and both of them gave testimony which tended to corroborate the younger DuBel. In addition Mr. Miller attended the auction sale and saw Klotzman and Kalavan there before the sale was over, but did not hear any conversation between them and Mr. Newell, nor did he see the check signed.

Myer Mindel testified that he attended the auction sale and remained there from its beginning until the end and heard the auctioneer's announcements; that he saw Kalavan and Klotzman arrive at the sale in a taxicab, and before the properties were finally sold, and after their arrival the auctioneer announced that the purchaser of No. 1801 was buying the other four at the same price.

Bernard Klein, a realtor, testified that he attended the sale; that he knew Kalavan and Klotzman well and recalled that they arrived at the sale after it had started; that, upon their arrival, the auctioneer stopped crying the property and announced that all five were being offered and the bid at that time was $1200 or thereabout, but after their arrival the bidding was more spirited. He could not say whether Kalavan had in fact placed any bids upon the property, but Klotzman was bidding; that Kalavan and Klotzman were standing near each other toward the curb; he further stated that when the sale was over Klotzman went to the auctioneer and there seemed to be "some wrangling," but he did not know its nature. The witness further testified that shortly after the sale Kalavan and Klotzman went over to the car, as did the witness, who told them that they had now bought the properties and could make money upon them by recreating the ground rents; that Klotzman could not get the meaning of his conversation and replied, "Oh, well you don't know anything about it any way"; that they were all wrangling in regard to recreating the ground rents, and he advised that when they got straightened out, if they wished to recreate them, to come down and see them, and later Klotzman told his uncle to "go ahead and recreate the ground rents," but the witness did not do so, because he had no written authorization; that he drew up such an authorization for Klotzman's signature, but the latter would not sign it until it had been inspected by his attorney, and agreed to see him a few days later; that later he did see him and Klotzman agreed to let him know, but nothing further came of it.

Sol Klein, another real estate operator, gave testimony to the effect that he attended the sale; that Kalavan and

Klotzman arrived "at the last minute when the sale was almost over," and after the sale he offered Klotzman $2000 for the corner property, but Klotzman wanted to sell all five properties and said, "I don't want to sell the corner."

Jacob Zetzer and John Heinz testified to the effect that after the arrival of Kalavan and Klotzman the auctioneer announced that five houses were being sold.

Morris Kalavan, one of the parties, is a brother-in-law of Klotzman, and conducts a grocery business in Baltimore. He testified that after lunch on the day of sale he learned for the first time from an insurance salesman that 1801 North Broadway was to be sold, and that around four o'clock on the afternoon of the same date Klotzman came to his place of business and they went to 1801 North Broadway in a taxicab, because the witness was looking for a house for himself and wife; that upon their arrival they found a crowd present, the auctioneer was standing on the steps of 1801 calling for bids, and he and the brother-in-law joined those present and, when bidding had reached $1450, he put on a bid of $1500 and "Mr. Newell who was on the front steps said, 'sold for $1500.00' "; that after their arrival they were just listening and he only made one bid upon the property; that they were some little distance from the auctioneer. He denied knowing that more than one property was being offered for sale, and stated that after the property had been sold to him for $1500 he approached the auctioneer, who required him to sign the contract, and then stated he would have to have a check, whereupon he asked if $500 would be sufficient and receiving a favorable reply he went to Jacob Klotzman, because he had no funds with him, and Klotzman gave his own check for the $500; that the auctioneer then required Klotzman to sign the contract because he had accepted Klotzman's check; that Klotzman at first refused to sign, stating to Newell that he was not the purchaser, but Newell said that because he had accepted his check he must sign the memorandum. The witness

could read and write, but could not say definitely whether the advertisements were attached to the contract which were signed by him, but even if they were so attached there is nothing from their phraseology which would impute to him the knowledge that he was expected to buy five properties instead of one. He also testified that he saw upon the top line of the memorandum that he was buying "1801 North Broadway," and further saw $1500 lower down, and then knew he had bought it at that price, but knew nothing of the contention that he was buying additional properties at the same price; that the auctioneer just handed him the paper and requested him to sign it and, evidently because of the auctioneer's haste, he could not read it at all except the top line and the purchase price. He was given a copy of what he and Klotzman had signed, but this, according to his testimony, did not have attached to it the advertisement of the property. He admitted hearing the witness Klein speak to Klotzman in regard to recreating ground rents, and stated that he "could not get the drift of what they were talking about"; that the first time he knew of any claim that he had bought five houses and not one house was when Klotzman told him an hour later; that then he hardly knew what to do about it, so he talked with Klotzman and went to see a lawyer. He denied making any application to any one for a loan, and further denied that he had given any one authority to apply for the loan for him. On cross-examination he admitted having asked the auctioneer if 1801 had hot water heat, and stated that the reply was that it did, and was subject to a ground rent, but throughout his cross-examination insisted that at no time did he learn that he was buying five properties.

Klotzman, the other appellant, testified that when he and Kalavan arrived at the sale, the auctioneer, who stood on the front steps of 1801, had a bid for the property of $1250 and he, Klotzman, asked Mr. Hamburger what kind of heat the house had, and learned that it was heated with hot water, whereupon he said to Hamburger,

"My brother-in-law wants a home for himself, do you think that would be good?"; that Hamburger assured him it was a fine home. It appears as a fact that the other four houses are heated by hot air furnaces. He stated further that they did not bid until the auctioneer had $1450, at which time Kalavan offered $1500, and bought the property; that there were no signs upon the other properties and he had no knowledge that they were being sold. The witness cannot read, nor can he write, except to the extent of writing his name. He, too, denied that the auctioneer after their arrival had made any statement that the purchaser of 1801 was buying the other four properties. His explanation of the conversation with Klein was that the latter, after the sale, had approached him, telling him he could make $625 on the ground rents, because he had bought five pieces of property and his reply was "I will let you know. I don't know anything about that"; that this statement from Klein was his first intimation of any contention that five properties had been sold. He testified further that on the following day he called Hamburger's office, but Hamburger was out of town; that on Monday he went to his store and found Hamburger's son, Hamburger still being out; that later he returned, held a conversation with his son, whereupon the son said to the elder Hamburger, "We are going to make him take it and they are going to take it and like it, and we are going to make him responsible"; that he told the elder Hamburger he did not come for an argument, but his brother-in-law was worrying himself "sick" about the properties, because he had bought only one and now they said it was five. At the conclusion of that conversation, Morris Hamburger told him he would have the properties resold and sue him for any deficiency.

His explanation of the applications for loans was that Mr. Newell had insisted that Kalavan must take the properties and they would look to the witness to pay the deficiency, and he asked Newell what could be done about it, and the latter said, "We will get you a mortgage";

that Mr. Miller was in the building loan association, half a block up the street, and he would call him in regard to it. After making the call, he requested Klotzman to visit Miller, because they had a "good buy." But the witness told Miller he could do nothing but report to his brother-in-law and see what he wished to do; that later he got to thinking possibly it was "a good buy," if they were willing to lend him $5000, and spoke to Mr. Townsend and explained the situation, but learned that the amount required could not be obtained.

Morris Hamburger failed to testify.

While it may be conceded that, leaving the contract out of consideration, the weight of the evidence lends strong support to the conclusion that appellants, or at least one of them, understood he was buying the five properties at the price of No. 1801, when the contract itself is considered, the question of determining their intention or understanding is not free from doubt. One of the appellants can neither read nor write, except his name, and it is undisputed that he simply signed the memorandum of sale, at the request and insistence of the auctioneer, that this was necessary because his check for the $500 deposit had been accepted. The contract itself relates to 1801 North Broadway and gives the price at which the property had been sold and, except for the two letters "ea," it could not be contended it bound them to purchase anything except 1801. The mere fact that those letters were used without any designation of the other properties in connection therewith or other verbiage to show how many, if any, additional properties were sold is certainly not a circumstance to put appellants on notice that the contract meant anything other than, as they contend, was their understanding and undertaking.

Moreover, the fact that the sale was going on when appellants arrived and was being conducted from the front steps of No. 1801, plus the further consideration that no signs appeared on adjoining properties, whereby they could know that they too were then being sold, are

circumstances tending to lend color to appellants' contention.

In *Bellevue Club v. Punte*, 148 Md. 589, beginning at page 598, 129 A. 900, 904, it is said: "While it may not be accurate to say that a contract must be proved 'beyond a reasonable doubt' before the courts will decree its specific performance, it is unquestionably true that in such cases the complaint must establish the allegations of the bill by clear, certain, and convincing proof, and the proof required 'is greater than that demanded in most classes of civil cases.'"

Parol evidence may be admitted to clarify an indefinite description of land (*Helmik v. Pratt*, 153 Md. 685, 139 A. 559), but it is never admissible to supply an omitted term, or make definite and certain that which the parties themselves have left indefinite and uncertain. *Loughran v. Ramsburg*, 174 Md. 181, 197 A. 804, and cases there cited, and 5 *Pomeroy's Equity Jurisprudence*, sec. 2188. See, also, *Miller's Equity Procedure*, sec. 656, and notes thereto; *Restatement, "Contracts,"* sec. 359; 5 *Williston on Contracts* (Rev. Ed.), secs. 1424, 1425.

Apart from parol evidence, little doubt could exist that the description of the property as contained in the contract could in no way aid appellees.

In *Fry v. Platt*, 32 Kan. 62, 3 P. 781, it was held that, in order to satisfy the requirements of the statute of frauds and certainty in the contract, it was necessary that the whole contract, with all its essentials be in writing, that its terms be definite and certain, or that they could be made definite and certain in reference to other instruments in writing or by reference to extrinsic and existing facts which were before the court. That holding is treated with approval by Pomeroy in a note to section 2188, appearing on page 4195. In the present case the contract, standing alone, does not aid appellees, and the extrinsic evidence produced by them to show that the purchase of five properties was clearly understood and intended is so flatly contradicted by appellants and their witness, whose versions are to some extent

230

supported by the admitted fact that the sale was almost over when appellants arrived, create further doubt that the allegations of appellees' bill of complaint have been established by such certain and convincing proof as to justify a court of equity in decreeing specific performance of the contract which they contend appellants entered into. *Diffenderffer v. Knoche*, 118 Md. 189, 84 A. 416.

Entertaining these views, we are not in accord with the decree appealed from, which must be reversed and the bill dismissed, leaving the parties in position to litigate their differences in a court of law.

*Decree reversed, with costs, and bill dismissed without prejudice.*