# GEORGE HENNEKE

## vs.

## THEODORE COOKE, JR., ET AL., ADMINISTRATORS OF THEODORE COOKE, DECEASED.

*Specific Performance—Sale of Land—Mistake by Vendor's Agent.*

The right to the specific performance of a contract is not absolute, and if the contract was made under such circumstances that enforcement would be unjust, inequitable and harsh, it may be refused, although the defense is not such as would warrant the rescission of the contract. p. 419

Where defendants' agent made a contract for the sale of a house bearing a named number on a certain street, under the mistaken impression that this was the number of an inside house of less value, while as a matter of fact it was the number of a more valuable corner house, *held* that a court of equity would refuse specific performance as against defendants, there being such a material difference in the value of the two houses that to enforce the contract would inflict substantial loss upon the defendants. pp. 422-426

The mistake of defendants' agent in inserting in the contract of sale the number of the more valuable house instead of that of the less valuable, *held* not the result of such inexcusable negligence as to estop the defendants from relying on it as a defense to a suit for specific performance. p. 426

*Decided December 10th, 1919.*

Appeal from the Circuit Court of Baltimore City (GORTER, J.).

The cause was argued before BOYD, C. J., BURKE, THOMAS, PATTISON, URNER, STOCKBRIDGE and ADKINS, JJ.

*Joseph Townsend England* and *J. Edward Tyler, Jr.,* for the appellant.

*Roland K. Adams* and *Vernon Cook,* for the appellees.

BURKE, J., delivered the opinion of the Court.

George Henneke, the appellant, filed a bill in the Circuit Court of Baltimore City against the appellees, who are the administrators of the estate of Dr. Theodore Cooke, who died on the 13th day of January, 1918. The bill prayed for the specific performance of a certain written contract, executed on the 15th day of June, 1918, between the plaintiff and Theodore C. Waters for the administrators of the estate of Dr. Cooke, for the sale of a leasehold property located in Baltimore City, and also for an injunction restraining the appellees from distraining upon the goods of the plaintiff and from ejecting him from the possession of the property mentioned in the contract. The injunction was issued upon the filing of the bill, but the Court upon final hearing passed a decree dismissing the bill and dissolving the injunction. From that decree the plaintiff appealed.

The contract which the plaintiff asked to be specifically enforced is here transcribed:

"This Agreement, made this 15th day of June, nineteen hundred and eighteen, between Theodore C. Waters, for the administrators of the estate of Theodore Cooke, of the first part, and George Henneke, of the second part:

"Witnesseth, That the said party of the first part does hereby bargain and sell unto the said party of the second part, and the latter doth hereby purchase from the former the following described property, situate and lying in the City of Baltimore and known as 1709 Collington avenue, subject to an annual ground rent of $48.

"At and for the price of fifteen hundred and seventy-five dollars, of which one hundred and 00/000 dollars have been paid prior to the signing hereof and the balance is to be paid as follows:

"Cash at time of transfer, not to be later than July 2, 1918.

"And upon payment as above of the unpaid purchase money a deed for the property shall be executed at the

vendee's expense by the vendor, which shall convey the
property by a good and merchantable title to the ven-
dee.

"Taxes, ground rent, water rent and interest to be
paid or allowed for by the vendor to date of transfer.

"Witness our hands and seals.

"Theodore C. Waters,

" For Administrators of Estate of Theodore Cooke.

"George Henneke.

"Test: Eugene H. Engle."

The property referred to in the contract is a corner prop-
erty, fitted up and used as a store, with a large show window.
It fronts 39 feet 4½ inches on the east side of Collington
avenue and is subject to an annual ground rent of $60.00,
and had been occupied by the plaintiff as a tenant for about
nine years at a monthly rental of $24.00. The appellees set
up several reasons why they refused to perform the contract,
but in the view we take of the case only one of these need
be considered. It is alleged by the appellees that the con-
tract was entered into by Theodore C. Waters under a mis-
take of fact as to the property sold, and that under the cir-
cumstances disclosed by the evidence it would be unreason-
able and inequitable to enforce it. The law applicable to
mistake as a defense to a suit for specific performance is well
settled in this State. The only possible difficulty that can
arise is in the application of the law to the facts of the par-
ticular case, which must be decided upon its own facts and
circumstances. In *Diffenderfer* v. *Knoche,* 118 Md. 189,
JUDGE BOYD, after stating that a sound public policy de-
mands that the contracts of parties should not be disturbed
or rescinded by the Courts for trivial or slight reasons, said:
"But it is equally well established that the right to the
specific performance of a contract is not absolute, and if one
is made under such circumstances as would make its enforce-
ment unjust, inequitable and harsh, it may be refused, al-
though the defense is not such as would warrant the rescis-

sion of the contract at the suit of the defendant. In *Sommerville* v. *Coppage*, 101 Md. 519, CHIEF JUDGE McSHERRY, in speaking for the Court, said: 'The granting of the equitable remedy is said to be a matter of discretion, not of an arbitrary, capricious, discretion—but of a sound judicial discretion, controlled by established principles of equity, and exercised upon a consideration of all the circumstances of each particular case.' Then, after explaining the meaning of what was meant by the discretion of the Court in such cases, he said: 'It is also settled that specific performance will not be decreed of a written contract to buy land, which on account of a mistake does not accurately express the terms really agreed upon by the parties. *Kraft* v. *Egan*, 78 Md. 36. It is a well established rule that in suits for the specific performance of agreements, even when written, the defendant may, by means of parol evidence, show that through the mistake of both *or either* of the parties, the writing does not express the real agreement, or that the agreement itself was entered into through a mistake as to its subject-matter, or as to its terms. In short, a Court of Equity will not grant its affirmative remedy to compel the defendant to perform a contract which he did not intend to make, or which he would not have entered into had its true effect been understood. 2 *Pom Eq.,* Section 860.'

"The principle stated at the end of that quotation was repeated in *Thomas* v. *The G. B. S. Brewing Co.,* 102 Md. 423, and again in *McLaughlin* v. *Leonhardt,* 113 Md. 261, what was said by JUDGE McSHERRY was quoted with approval. In 35 *Cyc.* 605, it is said: 'Unilateral mistake of a a defendant, not caused or contributed to by plaintiff, has frequently been admitted as a defense, when to enforce the contract would be harsh and unreasonable. In many but not all of the cases defendant's mistake is that of his agent. But where the unilateral mistake was not induced or contributed to in any way by the plaintiff, the defense is confined to cases where to grant specific performance would "be highly

unreasonable." A mistake which was solely the result of de-
fendant's inexcusable carelessness is not a defense to a suit
for specific performance.' "

Generally speaking, it may be said that in every case of
mistake there is found more or less negligence in the party
setting it up. The law has fixed no definite or absolute
standard by which the negligence may be measured. The
decision must be controlled by the circumstances of the case.
It is said in 2 *Pom. Eq. Juris,* Section 856, that: "It is not
every negligence that will stay the hand of the Court. The
conclusion from the best authorities seems to be that the
neglect must amount to the violation of a positive legal
duty. The highest possible care is not demanded. Even a
clearly established negligence may not of itself be sufficient
ground for refusing relief, if it appears that the other party
has not been prejudiced."

The record shows that Doctor Cooke and his son, H. Web-
ster Cooke, had been engaged upon a large scale in building
operations in Baltimore City for about twenty years. They
had erected several thousand houses. At the date of Doctor
Cooke's death he owned about two hundred and fifty houses
in Baltimore City. He died intestate, leaving surviving him
a widow, Sallie B. Cooke, and three children, viz: Doctor
Theodore Cooke, Jr., Sophie C. Waters, the mother of Theo-
dore C. Waters, who signed the contract set out above, and
H. Webster Cooke. Letters of administration upon the es-
tate were granted to the three children. By an agreement
between the widow and the children dated January 30, 1918,
it was agreed that property to the estimated value of fifty
thousand dollars should be conveyed to the widow, and in
addition thereto it was provided that she should receive an
annual income of five thousand dollars, and certain houses
were pledged to secure the payment of this income. The
right, however, was reserved to the children, with the con-
sent of the widow, to sell any property pledged for the pay-
ment of the annual income and to substitute other property

in lieu thereof.   This settlement was intended to be in lieu
of the widow's right of dower and distribution in her hus-
band's estate.   This agreement is not in the record, but it was
recorded among the Land Records of Baltimore City and is
spoken of in the evidence as a deed of trust.

Among the properties pledged to secure the payment of
this annual income was 1709 N. Collington avenue, the prop-
erty which is the subject of this suit.   About the first of
March, 1918, a tentative division of the real and leasehold
property of the decedent was made, and this division was
formally consummated by deeds of partition in the early part
of 1919.   The property in controversy (1709 N. Collington
avenue) was allotted to Doctor Theodore Cooke, Jr., and the
house 1711 immediately adjoining it on the north was allot-
ted to the widow of Doctor Cooke.   The Federal Estate Tax,
which the administrators were required to pay, amounted to
about $23,000, and it was agreed that this tax should be paid
in equal proportions by the children.   They decided to raise
the amount of this tax from the sales of property.   They
accordingly executed a number of contracts of sale, but as
they were unable to pass a good title until the tax was paid,
they determined to hold up the transfers until such time as
the amount from the sales should be sufficient to pay the tax,
and then make the conveyances at one time.

Theodore C. Waters, a grandson of the deceased, had been
employed for a short time in the office before his grandfather's
death, and after his death he was continued in the office by
the administrators.   His duties, as described in his evidence,
were "the collection of rents, keeping of the books, and gen-
eral duties like that."   It appears that prior to the tentative
division he had executed some contracts of sale in the name
of the administrators.   He had a general familiarity with the
property of the estate, acquired principally from his work
in the office and from an examination of the land records, and
from one day's trip which he made to inspect the property.
He did not know that 1709 N. Collington avenue was a cor-
ner lot, but thought it was an inside house which belonged to

his mother. While Mr. Waters appears to be an intelligent young man, and his testimony impresses us as being frank and truthful, he does not appear to be an accurate bookkeeper. His methods of bookkeeping were rather crude and somewhat confusing. We now state the circumstances attending the execution of the contract. On June 10, 1918, the plaintiff talked with Mr. Waters over the phone, and asked him the price of 1709 N. Collington avenue, and Waters told him the price was $1,600. On June 15, the plaintiff called upon Waters, and he gives this account of what was said and done: "I said, 'What did you say this house is worth?' He said, '$1,600.00.' I asked him, you understand, about 1709. He said, '1709?' I said, 'Yes, sir.' I said, 'Well, the pavement is in bad condition; what will you allow me to fix that?' He said, 'I will allow you $25.00 to fix it.' We had a little argument about that. I said, 'All right; I have a check here for $100.00; make up the agreement.' He made an agreement up and I made up one, and I gave him a check which went through the Clearing House." He further testified that Waters said the ground rent was $48.00 and that amount was written in the contract. Waters, testifying as to the execution of the contract, said: "Why, I am under the impression that Mr. Hennecke had come into the office about a week prior to the time the contract was made. I might have been mistaken about that and possibly he telephoned me, as he says that he did. When he did come into the office the second time I stated the price to him at sixteen hundred dollars; and then he spoke about the repairs, and I told him we would allow him twenty-five dollars off for the repairs that would be necessary to the pavement. At the time I thought I was selling my mother's house at 1711 Collington avenue, which was next door, as I had no authority to sell Dr. Cooke's house, 1709, but thought, as I say, was selling mother's house at 1711. Then we executed the contract, and I received Mr. Hennecke's check and deposited it." Asked why he thought 1709 N. Collington avenue was his mother's property, and not the store property that had been allotted to Dr.

Theodore Cooke, Jr., he testified as follows: "Why, after we made the distribution I drew up lists of properties that each one of the children were to receive and those lists were pasted into the cash book of each individual. When Mr. Hennecke came in, or rather when he either called up or came in, the first time, I must have referred to Doctor Cooke's list instead of to my mother's, and, as I say, I had no authority to sell Dr. Cooke's house, but I did have the authority to sell my mother's house and I thought I was selling it. Q. So when you went to look the property up you picked up the list that you thought was your mother's list, but which, as a matter of fact, must have been Doctor Cooke's list? A. That is right." The following questions and answers have reference to the mistake and the time of its discovery: "Q. When did you discover the mistake that had been made in entering into this contract? A. Why, about the first of the year. We had executed certain contracts of sale, and to pay the inheritance tax of the estate quite a number of the contracts had been put off until the estate would be settled and that money used to be applied towards the payment of the inheritance tax, and at one time we had those lists of the amount which each of the three children had to pay—each one of them was to give an equal share to the payment of the inheritance tax—and that list of my mother's included this house 1709 Collington avenue, which Mr. Webster Cooke spoke to me about and which we then found out the mistake. That was the first time I had known it. Q. And that was, you say, in January, 1919? A. Yes. Q. And all the time up until the time the mistake was discovered you thought that 1709 was the inside house which was really 1711 and thought that it was the property belonging to your mother? A. I did. Now, how did it happen that the ground rent set out in this contract was forty-eight dollars? A. I was under the impression that it was forty-eight dollars. The ground rent to 1711 was forty-eight dollars, and I thought—I knew mother's house there had a ground rent of forty-eight dollars on it, so I entered it on the contract. Q. Do you know what is the usual ground rent on

an inside house in that block? A. It is forty-eight dollars. Q. Do you know what the ground rent on the store is? A. It is sixty dollars."

We here quote from the testimony of H. Webster Cooke: "Q. What do you know about the discovery of this mistake? A. Why, I was looking over the various contracts with the view of realizing money to pay the inheritance tax. We wanted to put as many through at one time as possible. We tried to, and did pay it without going to bank to borrow money. Q. How much inheritance tax did you have to pay, approximately? A. I do not know. I think it was twenty-two or twenty-three thousand dollars. Q. Go ahead. A. And I was looking through and I came across this contract for 1709, and I recognized the house at once as that store which my brother had selected, and at first I thought that he had merely sold it, and all of the contracts were kept there together, so I did not notice it for a while until I got them all together, and I started putting the amounts down, and I noticed then it was only sold for $1575.00, and I asked Ted, Theodore, at once what it was, and he said, 'Why, that is mother's property I sold.' And I explained to him that this was the store front then. That was the first he knew of it and the first I knew of it. That was somewhere around the holidays."

The testimony of Doctor Theodore Cooke, Jr., as to the discovery of the mistake was to the same effect. He said that in going over the contracts about the first of January, 1919, to ascertain how much money they could realize from which to pay the Federal tax, "I found the contract and put it down on my ledger, $1,575.00. Then, on looking up above I saw a rental of $24.00. I knew I had sold other houses with rentals of $16.00 for $1,600.00, and it struck me there was something wrong, and at the same time my brother noticed it, it being brought to us by going over the accounts in that way, and my brother noticed it about the same time, and we found Mr. Waters had made the contract, and questioned

him. He said that he was under the impression that it was his mother's house, and in that way it came out." Upon the discovery of the mistake Doctor Cooke notified the plaintiff that the contract would not be performed. The testimony to which we have referred satisfies us that there was a clear mistake made as to the subject-matter of the contract, and this testimony is confirmed by the intrinsic evidence furnished by the contract itself, wherein the ground rent is stated to be $48.00 instead of $60.00 per annum.

Would it be inequitable to enforce the contract? The property sold was appraised at $1,700, and is subject to a ground rent of $60.00. It was sold for $1,575.00, subject to a ground rent of $48.00. As compared with 1711 N. Collington avenue, which Waters thought he was selling, it is a much more desirable and attractive property. We have carefully considered the testimony as to the respective values of the two properties; but, without discussing it, we will merely say that there is a material difference in the value of the two houses, and that to enforce this contract would inflict substantial loss upon the appellees.

The appellant has urged that the administrators ratified the contract made by Waters, and should not be heard now to question it. The evidence, in our opinion, falls far short of showing that the administrators, or either of them, with knowledge of all the material facts and circumstances attending the execution of the contract, ratified and approved it, or the act of Waters in making it. The claim of ratification is sought to be established as an inference from certain facts appearing in the record, but the inference from those facts is too inconclusive to overcome the positive and uncontradicted testimony of witnesses whose evidence we have no good reason to disregard. Nor do we think that under the circumstances the mistake made by Waters was the result of such inexcusable negligence as estops the appellees from relying on it as a defense.

*Decree affirmed, with costs.*