4500 SUITLAND ROAD CORPORATION ET AL. *v.*
CICCARELLO ET AL.

[No. 326, September Term, 1972.]

*Decided July 6, 1973.*

The cause was argued before MURPHY, C. J., and Mc-WILLIAMS, SINGLEY, SMITH, DIGGES and LEVINE, JJ.

*F. Robert Troll, Jr.*, with whom were *John C. Joyce* and *Duckett, Orem, Christie & Beckett* on the brief, for appellants.

*John R. Miles*, with whom were *Kahler, DeBlasis, Shipley & O'Malley* on the brief, for appellees.

McWILLIAMS, J., delivered the opinion of the Court.

Francesco Ciccarello (Frank) is the *capo* of the brotherhood consisting of himself, Antonio, Giuseppe and Giulio. Frank was born in Italy. His formal education ended with the fifth grade. He arrived in this country early in December 1957; he became a citizen in 1963. Since boyhood he has worked as an automobile mechanic; in 1965 he became shop foreman for a Washington automobile agency. His speciality is the repair and servicing of foreign cars. The record indicates that Giuseppe is a barber by trade, and that his mechanical skill is minimal, which seems to have been true also of Antonio and Giulio.

By 1970 it had occurred to Frank that if he was "able to

run [a garage] for somebody else . . . [he] probably [would] be able to run a garage for . . . [himself]." In the fall of 1970 he "saw this empty gas station . . . and [he] thought it would be a nice place to buy a garage if . . . [he] could." Inquiries revealed the appellant, 4500 Suitland Road Corporation (Suitland), as the owner of the property, the appellant Charles M. Fairchild (Fairchild) as the president of Suitland, and the remaining appellant Realty Corporation of America (RCA) (said to be owned by Fairchild) as Suitland's real estate agent.[1] The four brothers met with Fairchild and discussed the purchase of the gas station which at the time, or shortly thereafter, had fallen into a state of squalid desuetude. The pumps and the hydraulic lift had been removed, the doors were open and all of the glass had been broken. Some days thereafter Matthew R. Peterson (Peterson), an employee of RCA, who really considered himself an employee of Fairchild, presented a contract of sale to Frank. We must assume he had been informed and instructed by Fairchild. Clause 20 was as follows:

> "This contract is subject to the buyers' being able to obtain a special exception in order to use the property as a repair garage."

The four brothers signed the contract. When Peterson presented it to Fairchild for his signature he (Fairchild) objected to clause 20; he insisted it be modified to read:

> "This contract is subject to the buyers' being able to obtain a permit in order to use the property as a gas station."

As stated by the chancellor, Meloy, J., " . . . the cardinal intention . . . [was that] the contract [prepared by Peterson] was made for the benefit of the buyer to utilize the property as a repair garage." Fairchild, however, "would have no part of it. He had a gas station and he wanted to sell the gas station, [and he] was not about to get involved beyond that. Faced with that admonition [Judge Meloy

---

1. The appellants will be referred to as Suitland except where specific mention of Fairchild or RCA is necessary.

continued] . . . Peterson . . . asked them [the brothers] to come in to discuss certain changes."

Frank told Peterson he would like to use the property in the same way Prince George's Foreign Car Repair used its property. Peterson, according to Frank, said, "They used to be a gas station before and they do the same kind of work you wanted to do. We can get this permit out of the way, you can do the same thing, and you get this in two weeks." Frank claims he said to Peterson, "If we can get it in two weeks, [and] I can do the same thing, you go ahead and do it." Whereupon they all initialled the change. A day or two later Fairchild signed the contract.

As Judge Meloy put it:

> "Now, here is where we get down to the gravamen or the essence of this whole case. Was there a meeting of the minds? Was there mutuality of obligation? Was there a mistake, or did the Ciccarellos intend to abort this original intention and to apply for a permit to run a gas station with incidental right of repairs?"

On 18 January 1971 Frank signed an application, prepared by Peterson, to the Maryland-National Capital Park and Planning Commission for a use and occupancy permit to "operate an automobile filling station and incidental repairs." John Woryk, the chief of the Permits Office, in an affidavit in support of a motion for summary judgment, said the application was forwarded to the Park and Planning Commission for its recommendation. Edwin C. Woodburn, the supervisor of the Zoning Information and Permit Office of the Park and Planning Commission, in a similar affidavit said "that after determining that it would not be necessary to obtain a special exception to make use of the subject property as a gas station, the Park and Planning Commission approved the issuance of a use permit on 17 February 1971, provided the new gasoline pumps and islands were installed in their previous location." In a later affidavit Mr. Woodburn said, in part:

> " . . . [A]t all times prior to the filing of said

application the position of the Maryland-National Capital Park and Planning Commission with regard to the necessity of a special exception to repair a nonconforming use was that a special exception would be required and that a special exception was at the time required for the performance of major repair work at a gas station.

". . . [T]he Planning Commission indicated to Mr. Marvin R. Vaughan of the Department of Licenses and Permits that a special exception would be required before use and occupancy permit number 64-71 could be issued . . . .

" . . . [B]ased upon the subsequent interpretation of the Zoning Ordinance sections dealing with nonconforming uses made by our Associate General Counsel, . . . I informed Mr. Vaughan that a building permit could be issued to repair the gas pumps and islands that had been torn out and that a use and occupancy permit could be issued.

". . . [I]f use and occupancy permit number 64-71 had been issued to the Ciccarellos it would have entitled them to pump gas and make incidental minor repairs only to be completed within 48 hours and would not permit any painting, burning, welding, body, or machine shop work.

". . . [A] special exception would have been required before the Ciccarellos could have engaged in major automobile repairs such as an overhaul or the like."

Frank testified that when his attorney, William L. Kahler (retained after the execution of the contract), told him of the restrictions on repairs and that the pumps would have to be replaced, he said, "Why do I want another gas station. I would be crazy to ask for a gas station. . . . What do I want the pumps for? I don't need the pumps!" Frank also testified that when he spoke to Peterson about the removal of the lift

Peterson said, "Don't worry about it. Everything is going to be fixed up before you take it."

On 28 April 1971 counsel wrote to Peterson stating that the brothers had cancelled the contract and that they were demanding the return of the $5,000 deposit. On 22 November 1971 Suitland filed a bill of complaint to specifically enforce the contract of sale. All motions for summary judgment were denied. The case came on for trial before Judge Meloy on 1 November 1972. At the conclusion of the evidence Judge Meloy, in an oral opinion delivered from the bench, said:

"Now, I have had the opportunity to observe the demeanor of the witnesses, to judge their credibility, and I am convinced of the accomplished erudition of the plaintiff's witnesses. Fairchild is an astute, erudite business man in this locale. Peterson, of course, had been associated as a broker since 1948, I believe, some twenty-four, twenty-five years, almost twenty-five years. They are thoroughly cognizant of the ins and outs of real estate, or should be after twenty-odd years of experience. The defendant, on the other hand, manifested by Francesco, who has spent his entire life as a mechanic, repairman, as he said many times, of Volkswagens and foreign cars, presented a contract through Peterson to the seller to do just that, have a repair garage, which was modified to read, 'Subject to the buyers' being able to obtain a permit in order to use the property as a gas station.'

"Francesco and Giuseppe testified that Peterson, employee, agent, of the seller, told them that they would be able to conduct a business of repair according to the intention and statement of the Ciccarello brothers. Peterson denied that the words 'major repair' were ever uttered by him, but that he knew after discussions with the local authorities that incidental repairs such as tune-ups, could be accomplished incidental to the selling of gasoline and related products at a gasoline station.

"This is where I believe the mistake of intention of the parties was made. Thus I am of the opinion and hold that the contract from its inception was not a mutual meeting of the minds for the purpose for which it was intended by the defendants. I am convinced from the evidence that the Ciccarello brothers entered and ratified and affirmed the contract with respect to the modification of Clause 20 believing at all times that they would be permitted to conduct a general repair business on the property, and this is also buttressed by the statement of Fairchild that they could make extra —and I repeat—extra money with gasoline. Extra means something in addition to. I don't think in this instance there was any restrictions in the minds of the Ciccarello brothers that they would not be able to utilize this property as a repair garage, even though the wording of the modified Clause 20 was the use of a gas station.

"I think this intention throughout was not only predicated upon the sales talk, if you want to characterize it as such, by Peterson, whom I quite frankly don't believe, or am not impressed, let's put it that way, with respect to the securing of a permit in order for the Ciccarello brothers to conduct the business as they anticipated.

"Accordingly, I will dismiss the Bill of Complaint . . . and . . . decree that the deposit is to be returned to the buyer."

On 2 November 1972 Judge Meloy signed and filed a "Memorandum Opinion" which we think serves also as a decretal order. It is reproduced below:

"The court has heretofore rendered an oral opinion and adopts the same in full and further augmenting said oral opinion concludes that after careful review of the evidence and the exhibits in this case, that the complaint should be dismissed and the defendants entitled to judgment for costs.

"The basis for the decision being that the defendants were induced by the plaintiff to accept a modified condition mistakenly believing that they, the defendants, could conduct a repair business under a permit for a gasoline station and that where the mistake of the defendants was not as a result of culpable negligence or inexcusable negligence but as a result of representations by the plaintiff inducing and contributing to said mistake, specific performance of the contract will be withheld. To compel specific performance would be inequitable and highly unreasonable.

"The prayer for the return of the $5,000.00 deposit to the buyer under the counterclaim is granted. Other relief requested by said counterclaim denied."

There was no appeal from the denial of the "other relief" sought by the counterclaim.

We think *Whitney v. Halibut*, 235 Md. 517, 202 A. 2d 629 (1964), provides us with all the law this case requires. In respect of the application of the "parol evidence rule" to issues such as: (1) have the parties made a contract; (2) is that contract void or voidable because of illegality, fraud, mistake, or any other reason; (3) did the parties assent to a particular writing as the complete and accurate "integration" of that contract, Chief Judge Brune, quoting Professor Corbin (3 Corbin, *Contracts* § 573, 360 (rev. 1960)) said (in *Whitney*), for the Court:

" . . . 'In determining these issues, or any one of them, there is no "parol evidence rule" to be applied. On these issues, no relevant evidence, whether parol or otherwise is excluded. . . .' " *Id.* at 527.

Judge Brune went on to say:

" . . . In that case [*Brooks v. Towson Realty, Inc.*, 223 Md. 61, 162 A. 2d 431 (1960)], Judge Hammond speaking for the Court, said: 'We think the

proffered testimony should have been admitted, although not to aid in determining the legal existence or validity of the contracts or in varying their terms. It was proffered not only to show that what purported to be three contracts were actually one contract, but for the purpose of showing misrepresentations and lack of good faith on the part of Towson. We think it was material to show the situation and background of the parties and the subject matter of the contracts at the time they were entered into and to aid the court in determining whether the contract as to Parcel B was one which a court of equity would specifically enforce.' See also the authorities cited in *Brooks* at pp. 70-71 of 223 Md. In one of these, *Perlmutter v. Bacas*, 219 Md. 406, 411-412, 149 A. 2d 23, where after stating the general rule that equity will decree specific performance almost as a matter of course if the terms of the contract are clear and unobjectionable, we said: '[n]evertheless, the discretion of the court will be exercised to deny the relief where to grant it would be to compel the defendant to perform a contract which he did not intend to make or which he would not have entered into had its true effect been understood.' Among other authorities cited in *Brooks* and in *Perlmutter* are *Somerville v. Coppage*, 101 Md. 519, 523-24, 61 A. 318; *Ginther v. Townsend*, 114 Md. 122, 128, 78 A. 908; *Kappelman v. Bowie*, 201 Md. 86, 89-90, 93 A. 2d 266; and *Glendale Corp. v. Crawford*, 207 Md. 148, 114 A. 2d 33. Even an innocent misrepresentation may bar specific performance, and so may a mistake by the vendee only. See *Diffenderffer v. Knoche*, 118 Md. 189, 84 A. 416; *Henneke v. Cooke*, 135 Md. 417, 109 A. 113; and *Kappelman v. Bowie, supra*, as to the last point." *Id.* at 528-29.

Perhaps the most significant index of what Frank and his brothers had in mind arises out of the fact that Peterson had

prepared the contract, including the original version of clause 20, before he had ever met the Ciccarellos. His only source of information must have been Fairchild, a circumstance which suggests that the original version of clause 20 reflected what the parties had really agreed upon. Apparently Fairchild changed his mind when he realized that obtaining a special exception, if indeed it was obtainable at all, would delay settlement beyond the time he was willing to wait. So he decided to insist upon the modification of clause 20 and he left to Peterson the job of persuading Frank and his brothers that it simply provided a more expeditious method of obtaining the same thing. Judge Meloy was so "convinced from the evidence" and we cannot say his finding in that regard was clearly erroneous. Maryland Rule 886.

Suitland makes much of its contention that the mistaken belief of the brothers was the result of their own inexcusable negligence or carelessness. It relies on *Henneke v. Cooke*, 135 Md. 417, 109 A. 113 (1919), in which our predecessors acceded to the notion that a mistake which was solely the result of defendant's inexcusable carelessness is not a defense to a suit for specific performance and, to be sure, that seems to be a correct statement of the general law. Here, however, Judge Meloy found as a fact that the mistake "was not the result of culpable negligence or inexcusable negligence." Our examination of the whole record persuades us that his finding is probably correct and surely not clearly erroneous. Rule 886.

During argument counsel for Suitland cited the integration clause in support of its position. In the circumstances of this case, however, it can hardly be said to be conclusive. *Shoreham Developers, Inc. v. Randolph Hills, Inc.*, 248 Md. 267, 271-72, 235 A. 2d 735 (1967); *Whitney v. Halibut, supra*, at 528.

> *Order affirmed.*
> *Costs to be paid by the appellants.*