573 A.2d 418

**James C. SMITH, et ux.**

v.

**ROSENTHAL TOYOTA, INC.**

**No. 1358, Sept. Term, 1989.**

Court of Special Appeals of Maryland.

May 11, 1990.

**56**

Paris A. Artis, Hyattsville, for appellants.
Steven H. Sanders, Washington, D.C., for appellee.

Argued before WILNER, ALPERT and KARWACKI, JJ.

WILNER, Judge.

James and Carolyn Smith sued Rosenthal Toyota, Inc. in the Circuit Court for Prince George's County for fraud and for conversion of a 1981 Chevette that was owned by them. They appeal from the entry of summary judgment in favor of Rosenthal.

On July 10, 1987, after dropping his wife off at work, Mr. Smith stopped at the Rosenthal showroom to look at some trucks. He was driving the Chevette, which was titled in his name and his wife's jointly. He found a truck that he liked but told the salesman, one Willie McAllister, that he generally did not buy anything without his wife's consent. After some further discussion, McAllister asked Smith whether he had the title certificate to the Chevette. Smith recounted the conversation in his deposition testimony:

"I said yes, it's at home, but why would I need the title? He said, well, it's just a formality. We don't have any money in the house, and at this time he expressed to me well, why don't you take the truck home and test drive it for the weekend, and if your wife likes it, she can come back and sign and we'll finalize the deal. I said, well, that's the only way I can get the truck because it's quite obvious from what you are telling me that I don't make enough money. You know, that is what he expressed to me." [1]

At that point, the salesman drove Mr. Smith to his home so that he could retrieve the title certificate for the Chevette. On the way, Smith again asked the purpose of obtaining the certificate as it was in both names and again he was told that "it's just a formality." Mr. Smith got the

---

1. Mr. Smith testified that Rosenthal agents had told him on more than one occasion that on his income alone he would not qualify for the necessary financing and that his wife would have to pledge her credit as well.

certificate and returned to the showroom, whereupon McAllister told him that Rosenthal would get the truck ready for him to take home but that he would have to sign some papers. Specifically:

"Okay. After he [McAllister] came back [from talking with the manager], he told me, he said, well, they are going to clean the truck up, you can take it home for the weekend; if your wife doesn't like it, then you come back and, you know, if she likes it, we'll finalize the deal. If not, then things will go back to square one, is what Mr. McAllister told me. So I said okay. I then left my car there—no. We went to the finance office where they handed me some papers, which I never read, I just signed them. It took me like about three seconds to sign them and I was on my way."

The papers Mr. Smith so quickly signed consisted of (1) a retail installment contract under which he agreed to purchase the truck for $13,843, of which $2,800 was to be paid through the trade-in of the Chevette, $1,920 was to be paid in cash, and $9,122 was to be financed; (2) an agreement providing, in part, that if Rosenthal was unable to find a financial institution willing to buy the installment contract, it had the right to acquire the Chevette for $900; (3) the title certificate to the Chevette, which Smith endorsed in blank; (4) a written warranty that he had traded the Chevette for the truck, that he had good title to the Chevette free of all liens and encumbrances, that he would deliver good title within five days, and that he would "reimburse Rosenthal Toyota Company for the total amount of this vehicle if I cannot fulfill the above obligations;" and (5) a credit application showing his income from employment as a "houseman" for Days Inn as $16,000 and his wife's income as $42,000.

In addition to these papers, which Mr. Smith signed, Rosenthal gave him a "Notice to Cosignor" form advising a cosigner that "[y]ou are being asked to guarantee this debt" and warning the cosigner to "[t]hink carefully before you do" because "[i]f the borrower doesn't pay the debt,

you will have to." Inferentially, this form was given to Mr. Smith so that he could have Mrs. Smith sign it. *See* n. 1, *ante.*

Mrs. Smith arrived home late that Friday and did not see the truck until the next morning. She instructed her husband to return it, which he attempted to do the following Monday. Rosenthal refused to accept the truck back, however, insisting that Mr. Smith had bought it: "I said you told me that I had to bring my wife in here for signing these papers and he said no, no, we didn't need your wife's signature. He said you qualified. I said how could I qualify when I was told I didn't make enough money? He said well, we already done it. He said you bought a truck."

Mrs. Smith was working for a law firm at the time. When her husband informed her that Rosenthal had refused to take back the truck, she discussed the matter with one of the attorneys, who then called Rosenthal. The attorney was told to write a letter which, on behalf of Mrs. Smith, he did. Mrs. Smith hand-carried the letter to Rosenthal's manager that afternoon. According to Mrs. Smith, the manager read the letter, laughed at her, and told her that he would neither take the truck back nor return the Chevette. This action followed.[2]

The court granted Rosenthal's motion for summary judgment on essentially two bases. It first concluded that, as no promises, representations, or inducements had been made to Mrs. Smith, her action for fraud must fail. With respect to Mr. Smith's action and Mrs. Smith's suit for conversion of the Chevette, the court relied on clauses in two of the agreements signed by Mr. Smith on July 10: the warranty that he would deliver good title to the Chevette or reimburse Rosenthal if he was unable to do so, and the

---

**2.** Not satisfied with keeping the Chevette and refusing to take back the Toyota, Rosenthal filed a counter-complaint against the Smiths for converting the Toyota, which it sought to replevy, breach of contract, and trespass, through "unlawful detention and possession" of the Toyota. The court eventually dismissed the counter-claim.

concluding statement in the agreement respecting the approval of credit that "This agreement shall supercede [sic] and prevail over any prior or contemporaneous oral or written agreements entered into between the parties hereto." Though purporting to eschew any reliance on the parol evidence rule, which it said did not apply, the court found this integration clause dispositive, holding:

> "Now you are saying but he was told in order to induce him to sign the contract that that was a controlling provision. Said in legal terms, the provisions of what he was told were different than the provisions of what he signed. And that's exactly what the case says you can't claim; that if what you signed is clear and unambiguous and you had the opportunity to read it and understand it, and you didn't, then that is it."

We find no error in the court's disposition of Mrs. Smith's claim for fraud. We do not have the same confidence in its resolution of the other claims, however, and shall reverse the summary judgment entered as to them.

### Fraud Claims

In order to prevail in an action for tortious fraud, a plaintiff must show that (1) a false representation was made; (2) the falsity was known to the speaker or the misrepresentation was made with reckless indifference to its truth; (3) the misrepresentation was made for the purpose of defrauding the plaintiff; (4) the plaintiff relied on the misrepresentation, had a right to rely on it, and would not have done the thing from which the injury resulted if the misrepresentation had not been made; and (5) the plaintiff suffered loss or injury by reason of the misrepresentation. *Everett v. Baltimore Gas & Elec.*, 307 Md. 286, 300, 513 A.2d 882 (1986); *Martens Chevrolet v. Seney*, 292 Md. 328, 333, 439 A.2d 534 (1982).

As we indicated, the fraud count was based on averments, supported in deposition testimony, that Mr. Smith was induced to sign the various documents relied upon by Rosenthal as evidence of the sale of the truck upon the

express and repeated representations that the signing of those documents was a "mere formality" and that no purchase would or could occur without the approval of Mrs. Smith. Those representations, the plaintiffs claim, were never intended by Rosenthal to be honored but were made in order to induce Mr. Smith to sign the documents and then coerce the Smiths into completing the deal. A fair inference can be drawn from what allegedly occurred the following Monday that that was so—that Rosenthal never had any intention of returning the Chevette or allowing Mr. Smith to withdraw in the event his wife failed to approve the transaction. From that inference, the further inference can fairly be drawn that Rosenthal knew when it made the representations that they were false.

■ Two challenges are made with respect to these assertions, one of which, dealing with the claim made by Mrs. Smith, has merit. As the court correctly noted, there is nothing in the record to indicate that any of the culpable representations were made to Mrs. Smith. She was not induced to sign or do anything and therefore cannot establish the requisite elements for an action of fraud. That is not so with respect to Mr. Smith, however. If his assertions are taken at face value, each of the five elements of the tort would be established. As we observed, the court dismissed his claim on the basis that these assertions could not be considered because of the integration clause, and it is upon that theory that Rosenthal asks us to affirm.

■ We find two flaws in the court's decision. The most obvious one is that the integration clause relied upon by the court—the only one it could have relied on—was not part of the retail installment contract which evidenced the alleged sale and it was not part of the warranty agreement through which Mr. Smith promised to deliver good title to the Chevette. It is found only in the agreement to pay $900 in the event Rosenthal was unable to sell the retail installment contract and relates only to that agreement. It states that *"[t]his agreement* shall supercede [sic] and prevail

over any prior or contemporaneous oral or written agreements...." (Emphasis added.)[3] Moreover, as Rosenthal was apparently able to sell the installment contract, the agreement containing the clause became moot.

■ Even if we were somehow to regard the integration clause as applying to the other written agreements, it would not preclude consideration of the oral representations and understandings alleged. The notion of conditional delivery has long been recognized in this State—that it is competent for a defendant to show by parol evidence that the instrument upon which he is sued was delivered to the plaintiff to be held upon a condition to be performed before the plaintiff's interest could attach. See *Ricketts v. Pendleton*, 14 Md. 320 (1859); *Jenkins v. First Nat'l Bk. of Balto.*, 134 Md. 85, 106 A. 174 (1919). More recently, in *Foreman v. Melrod*, 257 Md. 435, 442, 263 A.2d 559 (1970) and *Saliba v. Arthur F. Charlotte, Inc.*, 259 Md. 588, 593, 270 A.2d 656 (1970), the Court declared it to be well settled "that the parol evidence rule does not prevent the introduction of parol evidence indicating that the written instrument was not to become *effective as an instrument,* until a prior condition or event had occurred."

The same result pertains even when there is an integration clause. As stated in *Restatement (Second) of Contracts* § 217, "[w]here the parties to a written agreement agree orally that performance of the agreement is subject to the occurrence of a stated condition, the agreement is not integrated with respect to the oral condition." Comment b to that section explains:

---

**3.** At oral argument, Rosenthal argued that all of these documents were incorporated into the retail installment contract. We reject that assertion not only because it is inconsistent with the plain wording of the documents but also because it would make the transaction illegal under the Retail Installment Sales Act. See Md.Com.Law Code Ann. § 12–604, requiring the instrument evidencing the "installment sale agreement" to contain "all of the agreements of the parties." If there is to be an integration clause applicable to that agreement, it must be expressly included in it.

"If the parties orally agreed that performance of the written agreement was subject to a condition, either the writing is not an integrated agreement or the agreement is only partially integrated until the condition occurs. *Even a 'merger' clause in the writing, explicitly negating oral terms, does not control the question whether there is an integrated agreement or the scope of the writing.*"

(Emphasis added).

■ This principle of allowing parol evidence of oral conditions is particularly applicable where the written agreement is challenged on grounds of fraud. In *Whitney, Exec. v. Halibut,* 235 Md. 517, 527, 202 A.2d 629 (1964), the Court, in discussing the parol evidence rule, declared its concurrence with the views expressed by Professor Corbin:

"Its name has distracted attention, he [Professor Corbin] says, from the real issues that are involved which 'may be any one or more of the following: (1) Have the parties made a contract? (2) Is that contract void or voidable because of illegality, fraud, mistake, or any other reason? (3) Did the parties assent to a particular writing as the complete and accurate "integration" of that contract?' He next states (p.360): '*In determining these issues, or any of them, there is no "parol evidence rule" to be applied. On these issues, no relevant evidence, whether parol or otherwise is excluded. No written document is sufficient, standing alone, to determine any one of them. . . .*' "

(Emphasis added). *See also 4500 Suitland Rd. Corp. v. Ciccarello,* 269 Md. 444, 306 A.2d 512 (1973).

■ It is clear, then, that the evidence offered by Mr. and Mrs. Smith regarding the representations made and understanding reached on July 10—that the purchase and trade-in were subject to the approval of Mrs. Smith—was admissible and, for purposes of defending against a motion for summary judgment, was dispositive. That evidence, taken in a light most favorable to Mr. Smith, sufficed to establish that

the written agreements relied upon by Rosenthal were induced by the dealer's fraud.

### Conversion Claims

■ Tortious conversion arises from "any distinct act of ownership or dominion exerted by one person over the personal property of another in denial of his right or inconsistent with it." *Hamilton v. Ford Motor Credit Co.*, 66 Md.App. 46, 64, 502 A.2d 1057 (1986), citing *Interstate Insurance Company v. Logan*, 205 Md. 583, 588–89, 109 A.2d 904 (1954). To recover in trover for such conversion, the plaintiff must either have been in actual possession or have the right to immediate possession of the item converted. *Hamilton*, 66 Md.App. at 64, 502 A.2d 1057.

The evidence here was clear that Mr. and Mrs. Smith were joint owners of the Chevette; the title certificate, which Rosenthal took special pains to get, made that clear. As we have indicated, Mr. Smith claims that he repeatedly told the salesman that he could not complete the purchase of the truck or trade-in of the Chevette without his wife's approval; indeed, there was evidence that, apart from the Smiths' desires, Rosenthal said that *it* could not complete the purchase without Mrs. Smith's approval because Mr. Smith's credit rating was insufficient.

■ Mrs. Smith, of course, did not sign any of the documents relied upon by Rosenthal to establish its interest in the Chevette; nor did Mr. Smith, orally or in writing, ever purport to be acting as agent for his wife. In short, when Mrs. Smith appeared on Monday and demanded the return of her car, Rosenthal had absolutely no basis for rejecting her demand. It may or may not have had some rights against Mr. Smith, depending on the validity of the so-called warranty agreement he signed, but it had no right to deprive Mrs. Smith of her right to possess the vehicle. Quite apart from the validity of anything signed by Mr. Smith, its refusal to deliver the Chevette to her constituted a tortious conversion of her interest in the car.

The situation as to Mr. Smith *might* be different if the various documents he signed were valid.[4] But, as we indicated, for purposes of summary judgment, the evidence sufficed to show that those documents were *not* valid, leaving Rosenthal with no cognizable basis to deny possession of the Chevette to Mr. Smith. He too then presented a sufficient case of conversion to avoid summary judgment.

## Conclusion

For the reasons noted, we conclude that the judgment entered on Mrs. Smith's action for fraud may stand but that the summary judgments entered on Mr. Smith's claims and on Mrs. Smith's claim for conversion must be vacated. The case will be remanded for further proceedings on those claims.

JUDGMENTS AFFIRMED IN PART AND VACATED IN PART; CASE REMANDED TO CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY FOR FURTHER PROCEEDINGS; APPELLEE TO PAY THE COSTS.

---

4. The title certificate for the Chevette was issued by and in the District of Columbia. It shows James and Carolyn Smith as the owners but does not indicate the nature of their tenancy. Under Maryland law, if it applied, they would be regarded as holding as tenants by the entireties. *See Beall v. Beall,* 291 Md. 224, 434 A.2d 1015 (1981); *Diamond v. Diamond,* 298 Md. 24, 467 A.2d 510 (1983). Under that form of tenancy, Mr. Smith alone could not convey even his interest in the vehicle, for the tenancy may not be severed by the consent of only one of the tenants. *Beall, supra.* We need not decide in this case whether Maryland law applies to the form of ownership or, if it does not, what the law would be in the District of Columbia.