HILL, SAND & GRAVEL COMPANY, INC. *v.* THE PALLOTTINE FATHERS HOUSE OF STUDIES, INC.

[No. 30, September Term, 1959.]

*Decided October 22, 1959.*

The cause was argued before BRUNE, C. J., and HENDERSON, HAMMOND, PRESCOTT and HORNEY, JJ.

*Cornelius F. Sybert, Jr.* and *Lewis S. Nippard, Jr.,* with whom was *William F. McDonald* on the brief, for appellant.

*Charles E. Hogg,* for appellee.

HENDERSON, J., delivered the opinion of the Court.

This appeal is from a decree ordering the appellant to pay the balance due upon the purchase price of a tract containing about 107 acres of land. For some years the appellee, the Pallottine Fathers, occupied the premises as a house of study and engaged, to some extent, in the excavation of sand and gravel from the premises for sale to the public. Several parcels of land contiguous to the land owned by the Fathers are owned by the Arundel Sand and Gravel Corporation and have been mined for sand and gravel. The land owned by

the Fathers consists of a tract containing 87¾ acres, where certain buildings are located, and another tract containing 20 acres which touches the main tract at a single point or corner.

In July, 1957, Mr. Pope, a salesman for a real estate firm got in touch with Mr. Williams, an officer of the appellant, to make an inquiry about a Mr. Hock, who was in the business of hauling gravel for himself and for the Arundel Corporation. The salesman told Mr. Williams that the Fathers planned to move their activities to another state, and that Mr. Hock was interested in the property, presumably on account of its gravel content. Mr. Williams and Mr. Pope visited the property the next day, where they met Brother Scholten and made a tour of the entire tract. On the following day, Mr. Williams had his attorney prepare a contract of sale, which called for settlement within 90 days, at a price of $110,000. Attached to the contract was a plat of the property, showing the location of the two tracts. The contract contained a clause that "this sale is made subject to an agreement between the party of the first part and the Arundel Corporation, dated August 3, 1951, relating to the use of roads." The contract was executed by both parties on July 29, 1957.

Mr. Pope testified, and Mr. Williams did not deny, that the agreement dated August 3, 1951, was delivered to Mr. McDonald, the attorney for the buyer, prior to the preparation of the contract of sale. A plat attached to the agreement showed the location of proposed mutual rights of way through the common corner, 60 feet in width, intersecting at right angles. The agreement provided that it should be in force and continue for a period of 10 years, with a right of renewal, by mutual consent, for a further period of 10 years.

Early in November, 1957, Mr. Williams requested permission to make certain test borings on the property, and permission was granted. The tests showed that, while the property contained deposits of sand and gravel to a depth of at least 15 feet, these deposits were generally intermixed with clay. A materials engineer, employed by the appellant, expressed the opinion that, while the tests showed the underlay to be "predominantly gravel," there "was too much clay in there to make it commercially profitable". There was also

testimony from a real estate expert that the property, without regard to its sand and gravel content and simply as a building site, was worth only about $40,000.

On November 20, 1957, Mr. McDonald wrote a letter to the appellee calling attention to "several defects in this title, the most serious of which is existence of a cemetery on this property." The letter demanded the return of the down payment. In December, 1957, the appellee filed suit for specific performance. Answer was filed, relying upon the existence of a cemetery as ground for its refusal to go through with the sale. Some six months later, by supplemental answer, the appellant alleged for the first time that it was induced to purchase the property by "representations * * * that a large part of said land was underlaid with 20 feet, or more, in depth with a good grade of road gravel * * *", but that its tests showed otherwise.

The appellant first contends that the title was not good and merchantable because there was a lack of access to the 20 acre tract. We find no merit in the contention on the facts. The appellant was fairly put upon notice that the only access to the 20 acre tract was by virtue of the agreement with Arundel. There would have been no occasion for the Fathers to make such an agreement if they had had other access. The buyer may well have thought that access under the agreement with Arundel, which was assured for more than 4 years from the date of the contract, would be sufficient for its purposes, or it may have believed that there would be no difficulty in obtaining a renewal of an agreement that was to the mutual advantage of the parties. In any event, the buyer entered into the contract with full knowledge of the situation, and cannot now be heard to complain. Cf. *Stewart v. Devries*, 81 Md. 525, *O'Sullivan v. Buckner*, 107 Md. 33, and *Stewart v. Kreuzer*, 127 Md. 1.

The appellant contends that the existence of a graveyard on the premises renders the title unmarketable. But we think the existence of a graveyard was not established. Father La Joie testified that when he first came to the property in 1937 he was told by some of the older students that there were a few graves there. He never saw any tombstones or mark-

ers, and no one ever came to visit the alleged graves. A Mr. Poulton, in a deposition, testified that he lived on the property until he was 18 years old, about 60 years ago. He was told by "the old folks" that his great-aunt Margaret, and two other persons, had been buried on the property many years before. His father did not own the property. It had been acquired by his father's older brother about 1869, and his father was allowed to occupy it upon payment of the taxes. The supposed location of the graves was "in the center of what we called the garden", but there were no monuments or markers. It is conceded that there is no reference in the chain of title to any graveyard, or reservation therefor. The chancellor found the evidence that any persons were buried there inconclusive, and we agree. Cf. *McDonough v. Roland Park Co.,* 189 Md. 659.

There are cases holding that where a private graveyard is established and clearly marked out, and markers maintained, an implied reservation or easement is created. *Hines v. State,* 149 S. W. 1058 (Tenn.) ; *Heiligman v. Chambers,* 338 P. 2d 144 (Okla. 1959). But in *Partridge v. First Ind. Church,* 39 Md. 631, 637, it was held that a public burial ground may be abandoned, and that the right of burial and visitation is not an easement but a revocable license. We need not decide the point in this instant case. Here the very existence of the graves rests entirely upon ancient rumor and hearsay. We agree with the chancellor that the proof does not raise such a cloud as to render the title unmarketable.

We come, then, to the final contention that there were representations as to the gravel content that proved to be untrue. The appellant does not now contend that the appellee or its authorized agents made any representations as to the quantity or quality of the gravel content. It concedes that Brother Scholten, who had been supervising the operation of a steam shovel and was alleged to have made certain statements as to gravel content, had no authority to bind the appellee. Mr. Pope testified, without contradiction, that he told Mr. Williams that the gravel deposits in front of the main building were "spotty". The appellant does not now rely upon any

charge of misrepresentation or fraud, but relies upon mutual or unilateral mistake as to the gravel content.

It is true that, under some circumstances at least, equity may refuse the remedy of specific performance because of an innocent mistake, whether mutual or on one side only. *Perlmutter v. Bacas,* 219 Md. 406, 412, and cases cited. The applicable principles are not greatly different from those applied in other cases involving rescission on the ground of mistake. Various tests have been laid down, but it has been observed that none of the conventional tests explain all the cases. Of course, the mistake must be material and go to the root of the contract. It has been said that the buyer must be free from culpable or inexcusable negligence, or that he must at least exercise reasonable diligence. *Gross v. Stone,* 173 Md. 653, 665. But in the *Perlmutter* case, failure of the buyer to ascertain that there were no adequate access roads to a tract bought for development purposes, was held not to bar relief from his obligation to perform the contract. In that case, the absence of access completely frustrated the purpose for which the tract was bought, and the case may be analogized to one in which the subject matter is nonexistent at the time the contract is entered into, *Franklin and Armfield v. Long,* 7 G. & J. 407, 420, or where there is a mistake as to its identity. *Diffenderffer v. Knoche,* 118 Md. 189; *Henneke v. Cooke,* 135 Md. 417. On the other hand, in *Wheat v. Cross,* 31 Md. 99, 104, a mistake as to the condition of a horse was held to be "wholly collateral", and not a ground for rescission, the buyer assuming the risk of quality under the principle of *caveat emptor*. See also *Banking Co. v. Fid. & Dep. Co.,* 165 Md. 657, 663, citing *Hecht v. Batcheller,* 147 Mass. 335, 17 N. E. 651. In the absence of misrepresentation, or inequitable conduct, by the seller, one who buys blindly must ordinarily take the natural consequences, as illustrated in the old adage about "a pig in a poke". There are cases in which rescission of a lease of mineral land has been decreed upon complete exhaustion of the ore before the expiration of the term of the lease. See the cases cited, Corbin, *Contracts,* § 600. But there are cases holding to the contrary. See note 26 A.L.R. 472, 482. Those cases in which relief

was granted proceed upon the theory that a stipulation as to royalty payments based upon ore mined is predicated upon the mutual understanding of both parties that the supply would continue during the life of the agreement. They rest on impossibility of performance upon breach of the implied condition. The situation would seem to be different in the case of an outright sale.

Several writers have suggested that the true test is whether the buyer can fairly be said, under the circumstances of the particular case, to have assumed the risk of the eventuality that renders the bargain less profitable. See Corbin, *Contracts,* § 605. Other writers suggest that the true test is not that of presumed existence, basic fact, or collateral purpose, but whether the eventuality was "within the realm of the bargain". A buyer is entitled to relief only where the eventuality is "outside the realm of the bargain", in the absence of equitable considerations other than the fact that the bargain proves to be a hard one. See 3 Pomeroy, *Equity Jurisprudence* (5th ed.), § 856 a, note 12; notes 13 Cal. L. Rev. 246, and 35 Harv. L. Rev. 757.

In the instant case doubtless both parties assumed as a basic fact that the property contained deposits of sand and gravel having some commercial value. Certainly the property did contain extensive deposits of sand and gravel which had been successfully mined by the seller. The only mistake was as to their quality and extent. Their value is a matter of opinion. We think the buyer took a business risk, and is no more entitled to relief from a bad bargain because the deposits were estimated to be meager, upon a spot check, than the seller would have been if they proved to be unexpectedly rich. The bargain was at arm's length. There was no warranty of content, and there is no evidence that the seller knew any more about the extent of the deposits than the buyer. Indeed, Mr. Williams, as an experienced operator, was in a better position to form an opinion than the Fathers. He made a personal inspection of the premises where excavation was in progress. He could have inquired as to the financial results of the operation. If he desired to make tests of the underlay, he could have done so before signing the contract.

Or he might have insisted that the contract, prepared by his own attorney, contain language making completion of the purchase contingent on future tests, or some warranty of gravel content. There was no element here of inexperience, or reliance upon the representations of a trusted agent, as in *Kappelman v. Bowie,* 201 Md. 86, 89, and *The Glendale Corp. v. Crawford,* 207 Md. 148. See also the comment on the *Kappelman* case in 14 Md. L. Rev. 368.

The appellee relies strongly upon *Baltimore v. DeLuca-Davis Co.,* 210 Md. 518, but that case is distinguishable on its facts. There, a bidder was allowed to rescind where there was a palpable mistake, of a clerical nature, in the computation of amounts summarized in the bid submitted, and the mistake was discovered and corrected before the bid was accepted. In the instant case the mistake was not put forward as a defense until the trial of the case, and was apparently an afterthought. In any event, we think the mistake in the instant case only went to the commercial possibilities of exploiting the tract in question, a risk which was fairly within the contemplation of the parties and within the realm of bargain.

*Decree affirmed, with costs.*